ED. C. MCFARLAND, Defendant in Error, v. DIXIE MACHINERY & EQUIPMENT COMPANY, a Corporation, Plaintiff in Error.—153 S. W. (2d) 67.

Division One, June 12, 1941.

Rehearing Denied, July 25, 1941.

*Roy W. Crimm, Walter W. Calvin* and *Calvin & Kimbrell* for plaintiff in error.

344

*Henderson, Deacy, Henderson & Swofford* for defendant in error.

HYDE, C.—This is an action for damages ·for personal injuries. Plaintiff had a verdict for $10,000. Defendant seeks review of the judgment therein, on writ of error.

Defendant's assignment is that its peremptory instruction, in the nature of a demurrer to the evidence at the close of the case, should have been given. Plaintiff was employed by the WPA (Works Progress Administration, an agency of the United States) on a project to straighten, deepen and widen the Blue River in Kansas City, and to beautify its banks. All labor, unskilled, intermediate, and supervisory, was employed, furnished and paid by the WPA, which had complete supervision of the project. This project cost about two million dollars (practically all for labor) and it took more than a year to complete it. Kansas City, as the sponsor of the·project, was required to furnish all machinery and equipment ' except trucks. Defendant was in the business of renting tractors, and other machinery, tools, and equipment. It rented these to the City and to contractors. One item of machinery, required to be furnished by the City for this project, was a caterpillar tractor. It was .admitted by plaintiff's counsel that ''the City went to this defendant and rented the tractor'' used on this project. Plaintiff also · offered the

testimony of defendant's superintendent who said this was a heavy tractor (about 12 tons) operated by a Diesel engine, and cost about $4800. Defendant furnished this tractor with a driver (Claude Whalen) to operate it and take care of it, supplied all grease, oil and fuel for its upkeep and operation, and kept it in repair, for the rental of fifty dollars per day. Defendant had a service man who inspected and repaired its rental equipment. This tractor was moved to the Blue River project (by truck) from another WPA project in Kansas City where it had been used for several months. Whalen was instructed that he would receive his orders from those in charge of the project, the superintendent or one of his assistants. He was told (according to plaintiff's witness) "to do whatever they wanted him to do with that equipment while he was out there, outside of jeopardizing the machine itself, like running in the river, which they did a few times." Whalen had no authority to allow anyone else to operate the tractor. He was paid by defendant on an hourly basis (according to the hours he worked) and could be discharged only by defendant. The WPA, if dissatisfied with his work, would have to ask defendant for another operator. If the tractor got out of order so that it could not operate, defendant would furnish another to replace it. There had been tractors, with other operators, on this project before Whalen went there. The City's proposal called for three tractors but there were never more than two on this project.

The WPA rules, requirements and plan of operations, were that it should have supervision over all equipment while it was on their project whether rented or otherwise. The Director of Administration testified as follows:

"THE COURT: Do you mean that you had entire supervision over it, exclusive supervision? A. We can tell the equipment where to work at what time we want it. Of course, we can't hire it or fire it. That is entirely up to the sponsor. THE COURT: I don't care anything about that, but just what is your requirement on rented equipment? A. Well, I would say we have full control over it while it is on our project. You have to if you are going to work. THE COURT: You mean in the manner in which the work is performed, regardless of how the equipment came upon the job? A. That is right. ██ THE COURT: After it gets on the job, who has the exclusive control over it? A. The WPA has control over that equipment. THE COURT: Now, that control is exclusive, is it? A. Insofar as its operation on that project is concerned, yes, sir."

The superintendent in charge of the project testified that he "was in full charge of the entire project, men and machinery." The men were divided into gangs of 30 or 40 with a foreman over each gang. There was also a line foreman (Mr. Shine) who "looked after the foreman on the line." (To supervise or coordinate the work of all foremen.) There was also a foreman (Mr. Keiter) in charge of the

machinery and equipment. Both of them under directions of the superintendent had absolute authority to direct the tractor driver's work. The superintendent "had exclusive charge of the work to be done or the doing of work by caterpillar tractors upon that project." The tractor "worked the entire project from one end to the other; used the tractor for pulling dirt with a fresno, it was hooked behind; also used the tractor for pulling stumps, and any use that we could see fit for using the tractor, we used it; . . . used it to smooth surfaces down by use of a blade." Sometimes it was necessary to use it to pull trucks out of the river. The tractor was left on the project all the time, and Whalen came there every morning to operate it. He was an experienced driver and no one undertook to tell him *how* to operate the tractor. The superintendent would tell him *where* to work and *what kind* of work to do with it. (Our italics.) He would not know what to do until the superintendent or a foreman told him.

Plaintiff (with another man) was assigned to work with the tractor as a helper. He helped to grease the tractor, cleaned mud off of it, and assisted Whalen in his work with it. The project superintendent said that he assigned plaintiff to that job. Plaintiff said he was assigned by Mr. Shine, and also that Whalen would tell him what to do. Plaintiff said he did not know about who directed Whalen. Plaintiff was injured on either the second or third day that Whalen operated this tractor on the project. (Whalen operated this tractor on this project for almost a year thereafter.) The work that they had been doing was called "bugging dirt." The tractor moved dirt with a scraper called a "bug," "tumble bug" or "fresno." Plaintiff testified that, in doing this work he sat on the seat of the tractor with Whalen and operated the bug by means of ropes. Whalen denied this. He said that he operated the bug himself and that there was not room on the seat for another man. In the afternoon of the day plaintiff was injured, the tractor was used to pull stumps out of the river. The tractor was sent to gang foreman Peterson and he "told him (Whalen) the stumps that were to be pulled." (Plaintiff said he "heard Peterson ask him to pull some stumps.") This was done by attaching a steel cable to the stumps. The other end of the cable was fastened to the drawbar, on the rear of the tractor, by being attached to a steel pin which fitted through holes in the drawbar. The tractor, which remained on top of the river bank, would pull out the stump and drag it to the stump pile some distance back from the bank. Plaintiff, with the other helper, would unhook the cable from the stump and the tractor would return to the river bank dragging the cable. When the tractor was returning, after several stumps had been pulled, plaintiff noticed the drawbar pin working up and he stepped up on the platform to which the drawbar was attached at the rear of the tractor. Plaintiff said, after stepping up

on the platform, he called to Mr. Whalen who didn't answer. Plaintiff punched him in the back and said, "This pin is working out;" Whalen said, "Go ahead and stomp it in." Plaintiff attempted to stomp the pin down with his right foot, and while he was standing on his left foot in the act of stomping the pin in, there was a sudden and unusual movement of the tractor; the front end of the tractor suddenly went down and the back end flew up and threw him to the left, and into the left-hand track of the tractor, and drew him between the track and the running board, crushing and wedging him between the track and the running board, which caused him to be seriously injured. There was evidence that the tractor was driven over the bank of a roadway. The WPA safety rules prohibited employees from getting on and riding on moving equipment. Plaintiff and the other helper were expected to follow the tractor, walking behind it. Plaintiff's evidence showed that most of the ground, between the stump pile and the river bank, was smooth.

It is not contended that Whalen was, at the time of plaintiff's injury, the servant of two joint masters. It has been ▇▇ said that "it is a doctrine as old as the bible itself, and the common law of the land follows it, that a man cannot serve two masters at the same time; he will obey the one and betray the other;" and that "he cannot be subject to two controlling forces which may at the same time be divergent." [Atwood v. C., R. I. & P. Ry. Co. (U. S. C. A.), 72 Fed. 447, l. c. 455.] Although there may be joint employment, and also acts for which more than one employer may be liable (Standard Oil Co v. Anderson, 212 U. S. l. c. 222; Restatement of Agency, secs. 226-227), nevertheless, there is no several liability of two persons (not acting jointly) as separate masters of a single servant for the same act. The basis for liability of a person, other than the actual master, is usually his personal participation in some form in the servant's act, as will appear from the situations shown in the above cited authorities. The question here is: Was there sufficient substantial evidence for the jury to find (if it disregarded all evidence to the contrary) that defendant was Whalen's master as to the work in which plaintiff was injured? While we quoted the testimony of WPA officers, who were defendant's witnesses, we do not deem it to be in conflict with the facts shown by plaintiff's evidence as to what was actually done.

Obviously, the facts in this case present a borrowed servant problem in an unusually complicated situation. Neither the WPA nor the City employed defendant to obtain a certain result; neither did defendant have anything to say about what work Whalen was to do. The City rented the tractor with a driver furnished, from defendant, and then lent both to the WPA. [For a double rental truck and driver case see Wagner v. Motor Truck Renting Corp. (N. Y.), 136 N. E. 229.] Our precedents have always ruled the

question of who is the master or employer, to whom the rule of *respondeat superior* is to be applied, principally upon the test of control. In O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. (2d) 1085, many cases in this and other jurisdictions were reviewed. This case has recently been approved in State ex rel. Chapman v. Shain, 347 Mo. 308, 147 S. W. (2d) 457, which quashed an opinion of the Kansas City Court of Appeals found to be in conflict with its rulings, which were stated as follows:

" 'While it is true that one may be in the general service of another, and, nevertheless, with respect to particular work, may be the servant of another, who may become liable for his acts, yet to escape liability the original master *must surrender full control of the servant in the performance of said work*. The fact that the servant is partially under the control of the third person will not release the original master for any wrongful act done by the servant in the ordinary course of his employment. . . .' The question of who is the master and therefore responsible for the negligent act of the servant is said to be determinable by who at the time has the right to control the acts of the servant causing the injury. . . . To escape liability the original master *must resign full control of the servant for the time being,* it not being sufficient that the servant is partially under the control of a third person. . . . 'It is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation. . . .' " (Italics ours.) .

In both the O'Brien case and the Chapman case, it was held that the truck driver remained under the control of his general employer who owned the truck involved. In both cases, however, the use of driver and truck involved was very limited. In the O'Brien case it was for only one trip in connection with a funeral; while in the Chapman case it was for hauling hay from a certain field under a contract with the driver's employer who was, clearly, an independent contractor. Cases in which this court has held there was substantial evidence to prove that the driver furnished by a general employer with a team or truck, were employees or servants of the special employer are Clayton v. Wells, 324 Mo. 1176, 26 S. W. (2d) 969; Maher v. Donk Bros. Coal & Coke Co., 323 Mo. 799, 20 S. W. (2d) 888; Karguth v. Donk Bros. Coal & Coke Co., 299 Mo. 580, 253 S. W. (2d) 367. These are reviewed in the Chapman case (347 Mo. 308, 147 S. W. (2d) l. c. 461). In all of them, there was evidence that the special employer had control of the physical conduct of the drivers as to what, when and where they should haul for him. [See also Gorman v. A. R. Jackson Kansas City Showcase Works Co. (Mo. App.), 19 S. W. (2d) 559; Roman v. Hendricks (Mo. App.), 80 S. W. (2d) ▪ 907; Simmons v. Murray, 209 Mo. App. 248, 234 S. W.

1009.] As stated in both the Chapman and O'Brien cases, the control must be the right of "full control of the servant *in the performance of said work,*" that is, "*full control of the servant for the time being,*" namely: the right to order and direct his physical activities in doing the work. [Vert v. Metropolitan Life Ins. Co., 342 Mo. 629, 117 S. W. (2d) 252, 116 A. L. R. 1381.] As we said in the Vert case, "perhaps the term 'right to direct' would express the rule more clearly than 'the right to control.'" Clearly our decisions have made this right of control, or direction, of the physical activities in performing service, the essential test to determine either who is the master of a particular servant as to any questioned act, or whether the relationship is that of servant or independent contractor. Some courts have also emphasized the test of whose business is being done. [Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480; Braxton v. Mendelson (N. Y.), 135 N. E. 198.] Justice CARDOZA undertook to state a formula for this rule in Charles v. Barrett (N. Y.), 135 N. E. *199;* and this test was followed in a recent CWA case, Devaney v. Lawler Corp. (Mont.), 56 Pac. (2d) 746, 1. c. 749.

In a recent article (Scope of the Business: The Borrowed Servant Problem, 38 Mich. Law Rev. 1222), which is a very helpful review of cases from many jurisdictions, Professor Talbot Smith, University of Missouri Law School, suggests a further test (criticising both the "control test" and "whose business test" as inadequate) called "scope of the business" analogous to "scope of employment" used in determining liability for acts of admitted servants. That is to "ask whether or not the questioned act (the servant's act causing damage) was within the normal scope of the business of the borrower of the servant;" and that "if the act of the borrowed servant was within the normal scope of the business of the borrowing employer, and there has not been, in fact and in good faith, a permissible farming out (of this part of the borrowing employer's business to the borrowed servant's general employer as an independent contractor), such borrowing employer should be liable." The American Law Institute's Restatement of Agency, sec. 227, states the rule as follows: "A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others." It is also said, in comment: "Whether or not the person lent or rented becomes the servant of the one whose immediate purpose he serves depends in general upon the factors stated in Sec. 220 (2)." This section would consider all of these tests as factors (under subdivision (a) is "the extent of control" and (h) apparently covers Professor Smith's test "whether or not the work is part of the regular business of the employer.") It is true, as Professor Smith also points out, that "every borrowed servant case

involves some *severance of employment* as far as the original, lending, employer is concerned, and the matter is purely one of degree." (Does not that really mean severance and transfer of some part of the right to direct?) It, therefore, seems logical that all of the factors, enumerated in Section 220(a), should be considered to determine the degree or extent of such severance and transfer; and that the ultimate basis of decision, between the general and special employer, as to who is the master on a particular occasion, must be the degree or extent of such severance and transfer in the specific situation. Whether the borrowed employee is doing something within the normal scope of the special employer's business is certainly a most important factor in determining the degree of severance and transfer; but so is the matter of who is exercising or may exercise the right of control in directing the details of his physical activities therein. Full control to do so may be surrendered by the general employer and assumed by the special employer, as to particular work, without completely or permanently severing the general employment as to other matters.

The proposition is thus stated in the Restatement in comment upon Section 227.

"Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting *in the business of and under the direction of* one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood ▮▮▮ between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed *in the business of and subject to the direction of* the temporary employer as to the details of such act. This is a question of fact in each case." (Our italics.)

As we also pointed out in the Vert case (342 Mo. 629, 117 S. W. (2d) l. c. 255), an employer is liable "only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged with the result of the wrong at the time of the injury, and in respect to the very transaction out of which the injury arose." If the act involved herein had been connected with the upkeep of the tractor (injury due to mechanical defects), or even its operation for a limited use, we might have a different question. (We note the Restatement comment as to value of machine and "the business of renting machines and men," as factors, p. 502; see Lowell v. Harris (Cal. App.), 74 Pac. (2d) 551, a case of sporadic use; but see also Van Deusen v. Ruhtz-Pike Eng. & Const. Corp., 246 N. Y. Supp 395.) However, here there was nothing wrong with the tractor. On the contrary, the act causing injury was solely one of alleged negligent driving over the very

ground that the borrowing employer (through its foremen) directed it be driven over to perform the task it directed the borrowed (or rented) employee to do. This task was certainly the work of the borrowing employer (an essential task to completing the project it was undertaking to do in deepening, widening and straightening the river); and it was likewise work within the normal scope of such employer's business on the project. It was solely directed by the borrowing employer which has full, complete and exclusive control as to when, how and by whom this work was to be done. It could use Whalen and the tractor therefor or not use them as it saw fit. Moreover, this employer had built the roadway and smoothed (or failed to smooth the ground) according to its plan for conditioning the river banks. Furthermore, the severance from defendant's employment was so complete and the actual renting employer (the City) had such full control, of both the rented machine and employee, that it could and did loan both to the borrowing employer, the WPA; and likewise so that such employer could move both from one WPA project to another. In addition, this was no temporary loan for a limited purpose or time, but this tractor was used (as was intended) by the borrowing employer for almost a year, during which time it was left on its project at night and the driver, Whalen, went there every day to work with it as the borrowing employer might direct. He did not know, until directed by the borrowing employer, whether he would pull a scraper to tear up the ground or pull a blade to smooth it. He did not know whether he would pull stumps from the river bank or pull trucks out of the mud; or on what part of the project he would operate the tractor or whether, or for how many hours, he would operate it on any particular day. Defendant would not even know what he had done with it at the end of the day, week or month unless it made inquiry.

Likewise the condition of the ground must have had something to do with the drawbar pin working up. Anyhow, the attachment of the cable to the steel pin in the drawbar of the tractor was no part of Whalen's duty to his general employer to operate the tractor so as to keep it in good working condition. Plaintiff's evidence shows that there would have been no damage to either the tractor or the cable if the pin had come out. It would only have allowed the cable to come loose and lie on the ground. This could only have interfered with and delayed the operations and business of the borrowing employer in taking time to re-attach the cable. It would have cost defendant nothing either in tractor rent or tractor repairs. The whole matter of pulling stumps was a matter entirely within the scope of the business of the borrowing employer and its superintendent and foremen had the exclusive right to, and did direct when, where, how and whether it was to be done. Any directions that Whalen gave plaintiff, as his helper, in connection with the work of pulling stumps was

by reason of authorization from the WPA superintendent or foreman, and, so far as the evidence shows, related solely to the business of the WPA at the time of plaintiff's injury. It further appears that getting on the tractor at this time was entirely plaintiff's own idea, and against his employer's specific rules and instructions, and not for defendant's benefit. All of these circumstances prove factors which conclusively show a severance, of Whalen's employment from his general employer, of a very complete and permanent character. There is not much dispute ▮ about how the operations of the borrowing employer were carried on; and there could hardly be since WPA operations have become so extensive and so well known. Plaintiff's evidence showed that Whalen was told by his general employer to do what the borrowing employer directed. So far as it appears he thereafter got no directions from any other source. Although plaintiff did not personally know about the arrangement concerning the supervision of Whalen, his testimony showed what his physical activities were under direction of the WPA foreman in the normal scope of its activities, and wholly failed to show any retention by defendant of control over or right to direct his physical activities, while on the project.

One of the first WPA borrowed employee cases is Shapiro v. City of Winston-Salem (N. C.), 194 S. E. 479. In that case, the City, as a part of its contribution to a WPA project, agreed to furnish "trucks and drivers for an equivalent of 400 hours," at the rate of eight hours per day per truck. There the City furnished the plans and specifications, but "the entire work was under the control of the WPA organization," and "employees furnished by it (the City) worked under the supervision and direction of the WPA officials." While thus working on the project a City truck driver "backed a truck into and against plaintiff's intestate, inflicting fatal injuries." A dismissal, after involuntary nonsuit, was affirmed.

The ruling of the North Carolina Supreme Court was, as follows:

"The uncontradicted evidence discloses that the defendant Masten Hawkes (the driver) was on the payroll of the City of Winston-Salem at the time of the occurrence complained of, which resulted in the death of the plaintiff's intestate. It also discloses, however, that at said time he was working under the supervision, control, and direction of the officials of the Works Progress Administration, and that the city was without authority to give him orders or directions as to the manner or method in which he should perform the work then being done. While the truck being operated by him was likewise the property of the city, the evidence also discloses that this truck was at the time in the custody of the WPA and was being used under its direction. Under these circumstances the doctrine of *respondeat superior,* as between the defendant Hawkes, and the city of Winston-Salem, does not apply."

This decision was followed in Wadford v. Gregory Chandler Co. (N. C.), 196 S. E. 815. [Similar cases are City of Los Angeles v. Industrial Accident Comm. (Cal.), 72 Pac. (2d) 540; Taylor v. City of Los Angeles (Cal. App.), 84 Pac. (2d) 242; Devaney v. Lawler Corp. (Mont.), 56 Pac. (2d) 746; City of Waco v. Hurst (Tex.), 131 S. W. (2d) 745; a case ruling a similar situation as between a city and a contractor is Board of Common Council v. Hall (Ky.), 13 S. W. (2d) 755; see also Williams v. City of Wymore, 292 N. W. 726; Hoover v. Independent School Dist. (Iowa), 264 N. W. 611; Brooks v. Seattle (Wash.), 74 Pac. (2d) 1008.] All of these cases emphasize the idea of contribution by the sponsor to the WPA of equipment and employees, and that the WPA was using both in the normal scope of its business with full right of direction over the physical use and activities it might require. We note provisions for compensation under situations like this have been made in the Federal Employees' Compensation Act. [U. S. C. A., Title 5, sec. 796; Title 15, secs. 721-728 notes.] It is our conclusion that plaintiff failed to show that a relation of master and servant existed between defendant and Whalen as to the work in which plaintiff was injured. We, therefore, hold that defendant's demurrer to the evidence should have been sustained and a verdict for it directed.

The judgment is reversed. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.