## PACIFIC EMPLOYERS INS. CO. v. LIBERTY MUT. INS. CO. et al.

### No. 12588.

United States Court of Appeals
Fifth Circuit.

April 25, 1949.

Rehearing Denied May 25, 1949.

WALLER, Circuit Judge, dissenting.

———◆———

Russell Talbott, of Houston, Tex., for appellant and cross-appellee.

F. Fox Benton and W. L. Kemper, both of Houston, Tex., for appellees and cross-appellants.

Before HOLMES, McCORD, and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

This action arose, under the Workmen's Compensation Law of Texas, Vernon's Ann.Civ.St. art. 8306 et seq. out of a fatal injury to an employee, sustained when he attempted to crank the motor of a dragline. The appellees and cross-appellants are the widow and children of the deceased. The other appellee is the insurance carrier of the special employer, for whom the deceased was working at the time of his injury. Our decision is governed by the

2

Texas law with reference to the doctrine of loaned employees.

The deceased, Oscar Walston, was a helper on the dragline, which was owned by Floyd Dixon and rented to the Knutson Construction Company. The hiring agreement was oral, and merely provided for a rental of $11 per hour for the machine fully operated, which means with everything necessary to its operation, including an oiler and operator, who were to be paid by Dixon. Walston was working under Prihoda, the driver of the machine, and was required to take orders from him. Except for the oiler and operator, Dixon had no representative on the job, and was not personally there himself except two or three times over a period of several weeks; and on each of these occasions he was present for only about an hour. The oiler's duties generally were to keep the machinery cleaned, oiled, and greased; help fix it if necessary; and, specifically, to crank the motor while the operator remained in the cab.

The special employer, Knutson Construction Company, had a representative, named Sims, on the job at all times, who told Prihoda, the driver of the dragline, what to do and where to do it. Dixon leased the dragline, with operator and oiler, for a fixed sum per hour, and knew nothing of the details of the work. He was furnished with no plans or specifications for laying the sewer. Knutson's representative had both, and gave specific instructions as to the grade, width, depth, and direction, of the ditch to be dug, where to pile the dirt, and how to dig when quicksand was reached.

■ The fatal accident occurred on June 10, 1947, shortly after the lunch period. The dragline had been operating satisfactorily since digging was resumed after lunch; but the motor had stopped because the vacuum tank was out of gas, which caused a delay of ten or fifteen minutes. After gas had been put in the tank, however, and the operator was ready to resume digging, Prihoda, instructed Walston to crank the motor, and the fatal injury happened while Walston was attempting to crank it as instructed. This brings us to the crucial point in the case. If the motor was cranked to ascertain whether or not it was fixed and ready for operation, as the last step in repairing it, then Walston was working for Dixon, his general employer, at the time of his injury; but, if the motor was fixed, and the vacuum tank was filled with gas, and Walston was instructed by Prihoda to crank the motor for the purpose of resuming operations with the dragline, i. e., in order to begin digging again, it is clear that the deceased met his death in the performance of services for his special employer, Knutson Construction Company. Undoubtedly, Walston was at all times subject to some control by both his general and special employers; undoubtedly, his work in oiling, greasing, and repairing the machinery, filling the tank with gas, and similar tasks, was done for and on behalf of Dixon; but it is equally certain that, if he undertook to crank the motor for the operator to begin digging again, he was working for Knutson Construction Company. If from the undisputed facts, and all reasonable inferences deducible from them, fair and reasonable men might draw different conclusions as to the ultimate fact involved, then the issue was for the jury to determine; otherwise, it was for the court. The majority of this court is inclined to the view that the undisputed evidence showed that Walston was serving the interest of Knutson Construction Company at the time of his injury and, as a matter of law, was in the latter's special employ; but it is not necessary for us to go that far in our decision, since the issue was submitted to a jury, which returned a special verdict on the subject.

■ At the close of the evidence in the court below, each insurance carrier asked for a directed verdict in its behalf on this issue, but the court denied both requests. In response to a special issue submitted by the court, the jury found that, at the time of the injury, Walston had been loaned by Dixon to Knutson Construction Company under such circumstances that he was an employee of that Company. Notwithstanding this, the court set aside the verdict of the jury, and entered judgment against Dixon's insurance carrier instead of

against Knutson's; and, in so doing, we think the court erred, because the following evidence of Prihoda was undisputed:

"* * * after oiling up that afternoon, we had another mishap with the drag-line; the motor went dead, and we had to fix it, and we fixed it, and when he went to crank the motor again was when the accident happened. (R. 69.)

\* \* \* \* \* \*

"Q. Now, on the day of this accident, and just before Mr. Walston went around to crank the motor, when he got hurt, had you been digging in the ditch? A. Before he got hurt?

"Q. Yes. A. Yes, sir.

"Q. The lunch hour had been over and you had gone back to digging, is that right? A. Yes, sir.

"Q. Now, tell us what you were preparing to do when you wanted Walston to start the motor? A. Well, I had to prime the vacuum tank on the fuel system there.

"The Court: Talk out louder, please, sir, so that the attorneys and the jury can hear you. A. And then I was preparing to choke the motor for him, when I got ready for him to start cranking.

"Mr. Talbott: Q. And when you got the motor started, what were you going to do then? A. We were going to continue digging as we had done up to that time.

"Q. Were Knutson's men ready for you to go on digging? A. Yes.

"Q. And you were planning to go on digging as you had been doing when the motor got started? Is that right? A. Yes.

"Q. Was that the reason that you were getting the motor started, so that you could dig? A. That is right. (R. 89, 90.)

\* \* \* \* \* \*

"Q. Didn't have any more trouble with it after you got started. Now, then, after this accident you did have to put some gasoline in the vacuum tank before the machine was started, is that right? A. After the accident?

"Q. Before you could start the machine, you had to put some gasoline in the vacuum tank? A. I had the vacuum tank filled.

"Q. On this occasion was it filled too? A. I had the vacuum tank filled at the time when I told Mr. Walston that I was ready for him to start it, and after the accident I started the engine myself, and I did not have any more trouble with it the rest of that day. I don't think we had any more trouble after that because I took the vacuum tank in and we fixed it. (R. 107, 108.)

\* \* \* \* \* \*

"Q. Had you attempted to do any work on it after it stopped? A. Yes, sir; we checked and found out what was wrong, the reason why it had stopped, and found out that the vacuum tank was out of gas, and so we filled it up with gas and was going to start it up again.

"Q. Mr. Prihoda, are you sure that the gas was put in before Mr. Walston attempted to crank this motor? A. Yes, sir.

"Q. Instead of after? A. Yes, sir, it was before.

"Q. It was before? A. Yes, sir, it was before. Mr. Kemper: I believe that is all." (R. 112, 113.)

We are not impressed with the argument that, because Walston's principal duties were to keep the dragline in good running order, and because he was not directly engaged in digging the trench, he was not employed by anyone but the owner of the machine. Such a narrow view of the evidence completely ignores the realities of the situation, and would practically nullify the application of the loaned-servant doctrine. We adhere to the view that the controlling question is not what was the nature and scope of Walston's principal duties, but what use was being made of the machine and what special duty was being performed by him at the time of the fatal injury. We have noted that one of Walston's special duties was to crank the machine while Prihoda sat in the cab. This was the initial and prerequisite step in digging with the dragline. In other words, as forcefully contended by appellant, it was just as if they were starting to dig in the morning, after the noon hour, or at any other time when digging was to be done. The motor had to be cranked, but cranking the motor was not

repairing it or maintaining the dragline. It was a part of the digging operation, just as stepping on the starter of a car is part of the operation of an automobile, and is not repair work.[1]

The argument that Walston spent much of his time sitting under shade trees, and doing nothing, is one that more profitably might have been made to the jury. The fact that both the majority and dissenting opinions quote from the testimony of Prihoda to support divergent views is further evidence that the court below did not err in submitting this issue to the jury. The statement that, at the time of the injury, Walston was attempting to crank a disabled motor was not an undisputed fact, but a very material issue before the jury. The argument that the dragline owner had the right to hire and fire Walston is not consistent with the unchallenged instruction of the court under special issue No. 7, that the test as to whose employee he was at the time inquired about was to be determined by whose work and whose business was being done at the time of the injury, and that it made no difference who had the right to hire and discharge the employee, or who was paying his salary.

The judgment appealed from should be, and hereby is, reversed, the verdict of the jury reinstated, and judgment entered here in accordance with the verdict.

Reversed and rendered.

WALLER, Circuit Judge. (dissenting). Concededly:

1. The law of Texas governs this case, and provides that in the case of a borrowed servant the employer who had the right of supervision and control of the servant in the work that the servant was doing *at the time of his injury* is liable for the injured servant's compensation.

2. The dragline and the deceased servant were Dixon's.

3. Dixon was required to maintain, oil, and operate the dragline, and Knutson had neither duty nor authority in these respects.

4. Dixon was to receive $11 for each hour the dragline was in operation—nothing for the time it was not.

5. Knutson hired the dragline to dig ditches—not to fix vacuum tanks.

6. Dixon hired Walston to oil the dragline as a part of the process of maintaining it, but not to operate the dragline or to dig ditches, and Walston did neither of these things. When the dragline was digging ditches for Knutson, Walston sat off under the shade of the trees, beyond the necessity or scope of Knutson's control or right of control. (See testimony of Prihoda, footnote 3 below.)

7. When, for mechanical reasons, the dragline stopped, Walston's services were called for, and he went promptly to work on Dixon's dragline—not on Knutson's ditches.

8. When the dragline stopped for repairs, so did Knutson's pay to Dixon, but not so with Dixon's pay to Walston.

9. When the injury occurred, the dragline had been shut down for approximately fifteen minutes, due to trouble with the vacuum tank. The dragline earned nothing until it began to operate again. (The fifteen-minute shut-down should have, and

[1] Hilgenberg v. Elam, 145 Tex. 437, 198 S.W.2d 94; Maryland Casualty Co. v. Donnelly, Tex.Civ.App., 50 S.W.2d 388; Texas Reciprocal Insurance Ass'n v. Latham, Tex.Civ.App., 72 S.W.2d 648; Steele v. Wells, Tex.Civ.App., 134 S.W.2d 377; Magnolia Petroleum Co. v. Francis, Tex.Civ.App., 169 S.W.2d 286; McFarland v. Dixie Machinery and Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 136 A. L.R. 516; Gaston v. Sharpe, 179 Tenn. 609, 168 S.W.2d 784; Shapiro v. City of Winston-Salem, 212 N.C. 751, 194 S.E. 479; Wadford v. Gregory Chandler Co., 213 N.C. 802, 196 S.E. 815; Devaney v. Lawler Corporation, 101 Mont. 579, 56 P.2d 746; Wylie-Stewart Machinery Co. v. Thomas, 192 Okl. 505, 137 P.2d 556; Restatement of the Law of Agency, Sec. 227.

In the case of Magnolia Petroleum Company v. Francis, supra, the court held that control over some borrowed employee could be exercised by another borrowed employee. Restatement of the Law of Agency, Section 227, says: "The fact that a person is the general servant of one employer does not, as a matter of law, prevent him from becoming the special servant of another who may become liable for his acts. He may become the other's servant as to some acts and not others."

doubtless did, cost Dixon one-fourth of $11.00, or $2.75.)

10. Walston was injured before the dragline went back to work. He probably was injured in an attempt to crank the motor, in which attempt he failed.[2] (Prihoda, the only witness to the accident, and the operator of the dragline, cranked it after the oiler had been injured and sent to the first aid station in Houston.)

11. A dragline that is not cranked and not running is a dragline that is not digging, and when the dragline was not digging, neither it nor its crew was working for Knutson. But even if it had been digging, Walston would doubtless have been "plumb off the job somewheres" as Prihoda picturesquely expressed it. (See footnote 3.)

12. The facts are not in dispute or in issue, but only the law. In resumé, the following are the undisputed facts:

Dixon, the owner, rented his dragline to Knutson, the sewer contractor, and agreed: to furnish an operator and oiler; to maintain the dragline; to furnish the fuel; to excavate whenever and wherever directed by the contractor. For this he was to receive $11.00 an hour for each hour of operation of the dragline. The oiler, a regular employee of the dragline owner, did not operate the dragline nor dig any ditches.[3] His duties were to look after the oiling, cleaning, and maintenance of his employer's machine. When, for some reason, in no wise attributable to the sewer contractor, the vacuum tank on the dragline failed to function, causing a shut-down of the dragline for ten or fifteen minutes in which to check, find out what was wrong, and to remedy the trouble, this regular employee of Dixon went to work. In this work he fell off the motor and was hit on his head by the crank. He was doubtless making an effort to crank the motor when he was injured, nevertheless he did not start the motor and, it was not started until after the injured oiler had been sent to the aid station in the City of Houston. Thereafter

---

[2] Prihoda, the only witness as to the manner in which the accident probably occurred, testified:

"Q. Did you give Mr. Walston instructions to start cranking the machine? A. Yes, sir, I did; I told him that I was ready, and he didn't start cranking it, and I heard him say something, but I didn't know what he was referring to, and I waited a couple or three minutes, and *he never had started to crank the engine*, so I got off of the machine and went to see what happened, and when I got around the machine there was a couple of fellows who were aiding him; he had fell, and they were wiping his face and helping him up. * * * I asked him what happened, yes, sir.

"Q. And what did Mr. Walston tell you? A. He told me that he slipped and fell off of the machine and the crank fell and hit him.

"Q. He told you that he slipped and fell off of the machine and the crank fell and hit him; is that right? A. Yes, sir, that is right. (Emphasis supplied.)

* * * * *

"Q. You just waited long enough until you discovered that the motor was not starting, and then you went around to see what was the matter, did you not? A. That is right.

"Q. Did you hear him make any turns of the motor with the crank before that? A. No, sir.

"Q. You didn't hear any turns of the motor? A. No, sir.

* * * * *

"A. I had the vacuum tank filled at the time when I told Mr. Walston that I was ready for him to start it, and after the accident I started the engine myself, and I did not have any more trouble with it the rest of that day. I don't think we had any more trouble after that because I took the vacuum tank in and we fixed it."

[3] Prihoda testified as follows as to Walston's duties:

"A. Well, the purpose of him being there was to grease the drag-line twice through the shift, the ten hour shift; he was to grease it in the morning before starting operations and grease it at noon, through the lunch hour, and then if any trouble came up on the machine, he was there to help me to fix it, if we were capable in our work to fix it, change cables and things like that; he was there to help maintain the drag-line.

"Q. Now, when there wasn't any trouble, what did Mr. Walston do—just stay on the drag-line with you or what? A. Well, at times he would clean up around the machine and inside of the machine, on the tracks, and at times he didn't do anything, just sat around the rig; maybe plumb off of the job somewheres.

* * * * *

"Q. Most of the time was involved in

Prihoda, the operator, cranked it and the excavation work for which the sewer contractor had hired the dragline was resumed.

The dragline owner had the right to hire and fire the oiler and the operator. He also had the duty to pay them according to the total hours they worked—not according to the hours they worked for the sewer contractor. He also deducted social security and victory taxes from Walston's pay.

These facts present only the legal question: "Who, under the law of Texas, was the employer of, and had the right to control, the oiler at the time he was injured?"

The Court below answered, in conformity to the decisions of the Texas courts, that he who had the right to direct and control him in the work that the servant was engaged in at the time of the injury was his employer.[4] Knutson had no authority to direct Walston how to start the motor any more than he had the right to direct him what tree to sit under or what to do when he was "plumb off of the job somewheres".

An attempt to crank the motor of a dragline is no more digging ditches than an attempt to crank an airplane motor is flying.

A dragline cannot dig merely because someone *tried* to crank its motor.

In view of the absence of any consent of Walston to become the employee of Knutson, in view of the undisputed testimony that his duties were wholly in connection with keeping the dragline in operating condition, and in view of the fact that he performed no services in Knutson's operations, there seems to be no justification for the conclusion that Walston was ever a loaned servant. Although there is no evidence to that effect, nevertheless if it had been shown that on occasions he was about the business of Knutson, still neither the jury, the judge nor this Court could rightfully conclude that he was a loaned servant at the time of his injury merely because he *attempted,* and failed, to crank a disabled motor.

It seems clear to me that there was no question of fact involved under Special Issue No. 7—but only a question of law which the Court below decided correctly.

I think that the judgment which the widow obtained against Pacific Employers Insurance Company was the proper judgment and that it should be affirmed.

---

standing around or sitting around, is that right? A. That is right."

"Q. During the time that you were on this job with Walston at any time did he ever relieve you as operator and operate the machine? A. No, sir.

"Q. He didn't do that? A. No, sir."

[4] The Court gave the following instruction to the jury under Special Issue No. 7: "In connection with this issue, you are instructed that a man may be in the general employ of one employer who is paying his salary, but that he may be loaned to another employer so as to become the special employee of such other employer as to the work he does for such other employer, and the test as to whose employee he is at the time inquired about in this issue is to be determined by whose work and whose business was being done at such time, and which employer had the right at such time to control him in the details of the performance of his work, and you are further instructed that it is not the actual control exercised which is determinative, but the right to control, and such right to control may be exercised by the borrowing employer through another borrowed employee, and, under such circumstances, it makes no difference as to who had the right to hire and discharge the employee, or who is paying his salary."