**John Riley CARNES, Appellant,**

v.

**DEPARTMENT OF ECONOMIC SECURITY, Commonwealth of Kentucky, et al., etc., Appellees.**

Court of Appeals of Kentucky.

Dec. 13, 1968.

way of the Louisville & Nashville Railroad Company in Manchester, Clay County, Kentucky. The ramp was 266 feet long, 24 feet wide, more than 10 feet high and contained 97,187 board feet of lumber. It had been used to load coal into railroad cars but this use had been discontinued sometime prior to April 7, 1966, when the ramp was destroyed by fire. On that date men participating in the Work Experience and Training Program (commonly called the Anti-Poverty Program) were burning brush nearby. The Department of Economic Security of the Commonwealth of Kentucky was designated as the state agency to administer the program. It secured applications from deserving people and arranged for them to participate. There were certain rigid requirements with respect to eligibility to work in this program, such as inability to secure employment in the labor market and an obligation to maintain dependent children. Qualified participants were assigned by the Department to work in projects of a public nature sponsored by a department or division of state or local government.

Before the Board of Claims Carnes sought recovery from the Department of Economic Security[1] on the ground that the negligence of the participants resulted in the brush fire igniting the lumber in the loading ramp. The referee reported to the Board:

"Thus, we have a situation in which a worker is under the supervision of the City of Manchester, doing work for the benefit of the City, while the hiring, firing, payment and ultimate responsibility for the supervision of the employee rested with the State of Kentucky.

The Referee is of the opinion that the W.E.T. workers are employees of the State of Kentucky, and in this particular case were on loan to the City of Manchester.

———◆———

Neville Smith, Manchester, Charles R. Luker, Jr., Luker, Luker & Roberts, London, for appellant.

Paul E. Tierney, James G. Childers, Dept. of Economic Security, Frankfort, for appellees.

STEINFELD, Judge.

Appellant, John Riley Carnes, owned a coal loading ramp located on the right-of-

---

1. The record before us does not reveal any legal action against the City of Manchester.

It seems clear under the cases cited in defendant's Brief that in this situation the borrower, City of Manchester, is liable for tortious acts of these employees while under the borrower's control, and that during the period of the borrower's control, the Department of Economic Security is not liable for such acts. Tindall v. Perry, (Ky.) 283 S.W.2d 700; Decker v. Glasscock Trucking Service, (Ky.) 397 S.W.2d 773"

The Board rejected the claim ruling: "That at the time of the asserted damage to plaintiff's property, the W.E.T. workers were loaned employees of the City of Manchester and no cause of action rests against the defendant, Department of Economic Security."

Carnes appealed to the circuit court which affirmed the Board, dismissed the complaint and in part adjudged:

"The Department of Economic Security had employed a number of men generally known as 'Happy Pappies' and let them to the City of Manchester where they worked under the supervision and control of the Police Judge at such public works as were designated by him.

While cleaning the river banks and burning trash they set fire to Plaintiff's coal loading structure and completely destroyed it to his damages in excess of ten thousand dollars.

The Department of Economic Security did not select the work to be done by these men nor direct how they did the work. They were under the directions and control of the City of Manchester.

The Department of Economic Security is not liable for the damage done under the 'Loaned Servant Doctrine'. See Tindall v. Perry, Ky., 283 S.W.2d 700, also Decker v. Glasscock Trucking Service, Ky., 397 S.W.2d 773."

From that judgment Carnes has appealed. We affirm. He argues that the Board was in error in finding that the Department was not responsible for the negligent acts of these employees who the Board said: "were loaned servants of the City of Manchester at the time in question."

The City of Manchester had made a Work-Training Program Application to secure participants in the program for work which complied with the provisions of the Economic Opportunity Act. After the application was approved an agreement was entered into between the Department of Economic Security and the city on the 18th day of January, 1966. It said that "The Division of Public Assistance will assign individuals, from among those persons certified under the Kentucky Work Experience and Training Program, to work on approved work projects undertaken by the local governmental unit * * *". The projects undertaken were required to be of a "public nature for the general welfare of the citizens of the local governmental unit * * *". The Department reserved the right to select the individuals it would delegate to the local governmental unit, "to transfer such individuals to or from such projects", to terminate the assignment and to discharge any participant. The Department had no power to direct the work and the city could not employ participants in the program. The agreement gave "the Division of Public Assistance * * * the right to inspect all work projects of the local governmental unit to which any individuals have been assigned * * * to determine the proper utilization of such individuals *. * *." "Necessary supervision" was to be provided by the city and it was to furnish all equipment, tools and materials. The contract stated that the Division of Public Assistance was not required to assign any individuals until the "work projects have been approved as qualified under this agreement by the Division." The Department carried Workmen's Compensation Insurance and paid the men with funds it received from the United States under the Economic Opportunity Act of 1964.

The project consisted of general clean-up work on the Manchester public streets and premises. The participants reported to the city building each morning where they were received by City Police Judge Tole Keith who was not employed by the Department and received no remuneration from it. He told the participants where to go and what to do during the working hours and supervised their work.

Dorsey Short, an employee of the Department, visited the projects from time to time and received reports from Keith which showed attendance and worker participation. Short explained certain rules to the employees and advised them that they were not supposed to work on private property but otherwise to follow the direction given them by Judge Keith. On one occasion Short reprimanded a worker for not performing his work but he did not direct the work or select the projects.

■ The complaint alleged that the Commonwealth of Kentucky on April 7, 1966, " * * * acting by and through its agents, servants and employees, each of whom was then acting within the course and scope of said agency, servitude or employment, negligently and carelessly caused and permitted a coal loading ramp owned by plaintiff to become ignited by fire * * *". Carnes contends that the arrangement between the Department and the city did not keep the men from being employees of the Department or relieve it of responsibility for their acts even under the loaned servant doctrine.

"Whether the relation of master and servant exists in a particular case must depend on its surrounding facts and circumstances, including the contract between the parties, and no one feature of the relation between them is determinative, but all must be considered together." 57 C.J.S. Master and Servant, § 563 A, p. 275.

■ In Johnson v. Louisville and Nashville Railroad Company, Ky., 394 S.W.2d 110 (1965), cert den 384 U.S. 921, 86 S.Ct. 1372, 16 L.Ed.2d 441 we said: "From this innocuous beginning the 'loaned servant' doctrine under the Federal Employer's Liability Act has grown into such a giant octopus of intermingled legal theories as to lead some federal courts to the brink of despair." The general rule is " * * * A servant may be loaned or hired by his master for some special purpose so as to become, as to that service, the servant of the person to whom he is loaned or hired, and to impose on the latter the usual liabilities of a master, the general or original master being correspondingly relieved." 57 C.J.S. Master and Servant § 566 A, p. 285 citing Bowen v. Gradison Construction Co., 236 Ky. 270, 32 S.W.2d 1014 (1930), and Johnson v. L. & N. Railroad Company, Ky., 394 S.W.2d 110 (1965), cert den, 384 U.S. 921, 86 S.Ct. 1372, 16 L.Ed.2d 441.

Bowen v. Gradison Construction Co., supra, held that "who selected the servant, and who pays him, are of such minor importance in comparison to whose work is being done and who has the power to direct it, that this record presents no question of independent contractor."

In Johnson v. L. & N. Railroad Co., supra, we reviewed many cases dealing with "loaned servants" and held: "Unless the *work was being performed for the defendant* in some realistic sense, we cannot even start on the tortious road toward a determination that the employee of another party may be labeled in law an employee of defendant."

Placing his principal reliance on the right of the Department to discharge those participating in the program appellant quotes from Messmer v. Bell and Coggeshall Co., 133 Ky. 19, 117 S.W. 346 (1909), wherein we said: "The right to control the conduct of another implies the power to discharge him from the service or employment for disobedience; and, accordingly, the power

to discharge has been regarded as the test by which to determine whether the relation of master and servant exists." and cites Summerville v. Waller, 262 Ky. 343, 90 S.W.2d 65 (1936); Klein v. Lakes, 269 Ky. 43, 105 S.W.2d 1041 (1937) and Turner Construction Company v. Garrett, Ky., 310 S.W.2d 786 (1958). In Turner we said that "It is true that Smith Brothers retained the right to fire Jenkins from his employment with them, but they did not retain the right to fire him from his employment with the appellants * * *. The test of whether a servant doing a special service for a third party becomes the servant of the third party depends on who controls the servant while he performs the special service. The right to discharge the servant immediately gives complete control."

In the present case the control of the servant while he performed the service he was rendering was not in the Department of Economic Security except insofar as it could remove him from the program. It did not control him while he performed the service in the sense that that term was used in Turner v. Garrett, supra.

Commonwealth ex rel. Division of Unemployment Insurance v. Kendall, 313 Ky. 735, 233 S.W.2d 511 (1950), was an action by the Division of Unemployment Insurance to recover contributions which it claimed were owed by Kendall, a real estate broker, for compensation paid to salesmen working out of his office. In holding that "the legal relationship of employer and employee did not exist between the broker and the salesman" after reviewing many cases we wrote: "In 56 C.J.S. Master and Servant § 2, p. 33, it is said: 'The essential characteristic of the master and servant relation is the retention by the employer of the right to direct and control the manner in which the work shall be performed, the right to determine not merely the result but the methods and means by which such result is to be accomplished.'" Also see Blair v. Boggs, Ky., 265 S.W.2d 795 (1954).

In Greene v. Pennington, 270 Ky. 28, 108 S.W.2d 1013 (1937), where a similar issue arose we said: "The question is, Whose work was being done?"

In Smith v. Gennett, Ky., 385 S.W.2d 957 (1965), Smith sued for damages growing out of an automobile-truck accident. The driver of the truck was held to be an independent contractor and not an employee of Gennett. We held: "The question at issue is whether Carter was a servant of Gennett at the time of the accident. Appellant reasoned that Carter was a 'loaned servant'—that he was loaned to Gennett by Killion" who furnished trucks and drivers. We said: "An examination of the foregoing authorities confirms the proposition that a servant may be loaned or hired by his master for some special purpose so as to become the servant of the party to whom he is loaned or hired for that particular service. Moreover, those cases confirm the principle that the basic test is who controls the servant in the particular employment."

The City of Frankfort awarded to Andrews Asphalt Paving Company a contract to improve streets. On suit by a property owner for damage to his fence we held the paving company not liable saying: "The city was in sole and exclusive charge of the work, and in like control of the men and machinery. The men were under the orders of the city, and it could begin and stop the work at will. Under such circumstances, the owner of the tools and machinery is not liable for damages arising from the acts of the city while using the appliances lent to it." Board of Common Council of Frankfort v. Hall, 227 Ky. 599, 13 S.W.2d 755 (1929).

In Perry County v. Tyree, 282 Ky. 708, 139 S.W.2d 721 (1940), Tyree sued the city and county for damages sustained in the construction of a county road which extended into the city. " * * * (T)he project was planned and financed by the Works Projects Administration, whose agents and

employees were in complete charge of the operation. All that the County and City did was to furnish the rights-of-way pursuant to an agreement between them that when the road was completed the City would convey to the County the rights-of-way secured by the City." In denying liability we said: "Under the facts stated it is as once apparent that liability cannot be predicated upon the doctrine of respondeat superior, * * *."

Hughes v. City of Duluth, 204 Minn. 1, 281 N.W. 871, 120 A.L.R. 1144 (1938), held that a city could properly be found to have had control over the work being done by W. P. A. workers so as to make it responsible for their negligence. Cf. Annotation 120 A.L.R. 1148, "Responsibility for injury or damage by or to W. P. A. worker or other workman employed as a means of reducing unemployment."

At the request of Churchill Downs the Governor of Kentucky in Fournier v. Churchill Downs—Latonia, Inc., 292 Ky. 215, 166 S.W.2d 38 (1942), ordered National Guardsmen to police the Downs on Derby Day. The Downs furnished weapons to some Guardsmen and the superintendent of the track designated locations and duties of the men. Fournier, a patron, was injured when clubbed by a guard who sued. In holding "the petition, if supported by the evidence, sufficient to establish that the Governor of the Commonwealth loaned to appellee the services of the Guard, placing them under appellee's control for the purpose of maintaining order within the limits of its private place of business, and for the protection of its property thereat" we said:

"The test as to whether or not the offending servant or employee has committed an act for which his private employer will be rendered liable would seem to be, whether (1) the act is of the kind the offender is employed to perform; (2) it occurs substantially within the authorized time and space limits of the employment, and, (3) the offender is actuated, at least in part, by a purpose to serve the master. A.L.R. Restatement of the Law of Agency, Volume 1, Section 228, page 505. This test in substance was adopted in Hill v. Poindexter, 171 Ky. 847, 188 S.W. 851, 852, L.R.A.1917B, 699, wherein, quoting from a Supreme Court case it was said:

'The question is one of agency. The result is determined by the answer to the further questions, whose work was the servant doing? and under whose control was he doing it?' "

In McFarland v. Dixie Machinery & Equipment Company, 348 Mo. 341, 153 S.W. 2d 67, 136 A.L.R. 516 (1941), McFarland was an employee of the W. P. A. on a river straightening project. Labor was paid by the the W. P. A. which had complete supervision of the project. Kansas City "was required to furnish all machinery and equipment except trucks." Dixie Machinery lent a tractor to the city and furnished the driver, Claude Whalen, "to operate it and take care of it, supplied all grease, oil and fuel for its upkeep and operation, and kept it in repair; * * *". Its service man inspected the equipment. "Whalen was instructed that he would receive his orders from those in charge of the project, the superintendent or one of his assistants. He was told (according to plaintiff's witness) 'to do whatever they wanted him to do with that equipment while he was out there, outside of jeopardizing the machine itself, like running in the river, which they did a few times.' He was paid by defendant * * * and could be discharged only by defendant." The W. P. A. could ask defendant for another operator. Another W. P. A. employee was injured and sued Dixie. In denying recovery the court opined "The question here is: Was there sufficient substantial evidence for the jury to find (if it disregarded all evidence to the contrary) that defendant was Whalen's

master as to the work in which plaintiff was injured?" It pointed out that the test is " * * * the control must be the right of 'full control of the servant in the performance of said work,' that is 'full control of the servant for the time being', namely: the right to order and direct his physical activities in doing the work." It held that the term "right to direct" and "scope of business" would be the better test. In other words "Whose business is being done?" and emphasized that the control of the physical activities is the crux of determining liability. It stated the critical question is who has the "authority to give him orders or directions as to the manner or method in which he should perform the work then being done." Also see annotation in 136 A.L.R., page 525.

In re: Galloway's case, Mass., 237 N. E. 2d 663 (1968), Joan Galloway sought work through an employment service which obtained for her temporary employment at Sylvania Electric Products. "Conditions of her work, its nature, and the time expended by her on it were subject to direction of individuals at Sylvania. If Sylvania were at any time dissatisfied with her work it could so indicate to Certified and arrangements for a satisfactory replacement would be made." She injured herself and then claimed workmen's compensation from Sylvania. The court opined:

"As Travelers has pointed out, the language of Langevin's Case, 326 Mass. 43, 47–48, 91 N.E.2d 920, is apt in the determination which we make here. 'In Coughlan v. [City of] Cambridge, 166 Mass. 268, 277, 44 N.E. 218, 219, this court said, "It is well settled that one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become, as to that service, the servant of such third party. The test is whether, in the particular service which he is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired." * * *. It is not decisive that he was paid by the one whose general servant he is. Hasty v. Sears, 157 Mass. 123, 124, 31 N.E. 759, 34 Am.St.Rep. 267. And it is not decisive whether the one to whom he is lent or hired actually exercised control, if he has the right to do so. (Citing many cases)

The evidence was such that it could have been found in this matter that the employee sustained an injury in the course of her employment. The accident occurred while she was engaged in fulfilling her responsibilities at Sylvania. Souza's Case, 316 Mass. 332, 334, 55 N.E.2d 611.'"

Applying the same test are cases noted in the annotation 136 A.L.R. 516. Also see A.L.R. Blue Books of Supplemental Decisions.

■ In the case now before us the work was not being performed by, for or under the control of the Department when Carnes' ramp burned. The City of Manchester exclusively had the right to start, stop and direct the manner in which it was to be done. The Department was not liable to Carnes. Tindall v. Perry, Ky., 283 S.W.2d 700 (1955), and Decker v. Glasscock, Ky., 397 S.W.2d 773 (1965).

The judgment is affirmed.

HILL, MILLIKEN and PALMORE, JJ., concur.

MONTGOMERY, C. J., and OSBORNE and WILLIAMS, JJ., dissent.