ADA F. BURKE, Respondent, v. SHAW TRANSFER COMPANY, Appellant.

In the Kansas City Court of Appeals, June 26, 1922.

1. **CARRIERS: Evidence Held Sufficient to Show That at Time of Injury to Passenger in Taxicab Chauffeur was Under Control of Defendant and Operating Same in Course of Its Business.** In an action for damages for personal injuries evidence *held* sufficient to show that at time of injury to a passenger as a result of an abrupt and sudden lurch of a taxicab, in which she was returning from a funeral, that the chauffeur was under control of defendant, taxicab company, and operating the same in the course of its business.

2. ———: **Defendant Operating Line of Taxicabs Held to Have Been a Common Carrier at Time of Injury to Passenger, Regardless of Who Paid for Service.** Where defendant operating a line of taxicabs for hire sent a taxicab in charge of a chauffeur to carry persons for undertakers, and the chauffeur in operating same was to some extent under the direction of funeral director, but defendant, taxicab company, did not surrender complete control, *held* that as to plaintiff it was a common carrier and liable for the

211 M. A.—23

negligent injury to her while riding as a passenger therein, regardless of who paid for the service.

3. **EVIDENCE: Admission of Evidence of Passenger Injured While Riding in Taxicab That it Was Going Very Fast and Struck Something, Held Proper.** In an action for personal injuries to a passenger while riding in a taxicab, there was no error in admission of evidence of plaintiff that at the time of her injury the taxicab was "going very fast," and that "it struck something."

4. **DAMAGES: Instruction on Measure of Damages in Which Word "Injuries" was Used, Held Not Too Broad and to Properly Require Jury to Consider Only Such Injuries Resulting Directly from Negligence of Defendant.** An instruction on the measure of damages objected to on the ground that it authorized the jury, in the event they found for plaintiff, to assess her damages at such sum as in their judgment, under all the evidence, would reasonably compensate her for the injuries received, was not erroneous in failing to require the jury to consider only such injuries as were the direct result of the alleged acts or omissions of defendant as the word "injuries" used therein was not too broad, and included the results of the damage sustained by plaintiff from the bump or jolt shown by the evidence.

5. ———: **Instruction on Measure of Damages Held not Erroneous as Submitting Permanency of Injuries.** An instruction on measure of damages that, if jury found for plaintiff, to assess damages at such sum as would compensate her for injuries received, was not erroneous as submitting to jury the question of whether plaintiff's injuries were permanent, since there was evidence that they were permanent.

6. **EVIDENCE: Admission of Testimony by Plaintiff That She Had Been Examined by Defendant's Physician Held not Error.** The court did not err in permitting plaintiff to testify that during the trial she had been examined by a physician at suggestion of defendant, where the record showed that the physician who examined her was in court during her testimony, but was not called as a witness, and her testimony was supported by the statement of the court to the effect that, upon application of defendant for appointment by court of a physician to examine plaintiff, her counsel had stated she would submit to an examination by any physician suggested by defendant.

7. ———: **Verdict of $5000 for Probable Permanent Injury to Nervous System, Held not Excessive.** Where the evidence showed that plaintiff prior to her injury, was a vigorous, healthy woman, and as a result thereof she suffered a nervous collapse and since has

been beset by pain and melancholy and there was substantial proof that her condition would be permanent, a verdict for $5000 was not excessive.

Appeal from the Circuit Court of Jackson County.—*Hon. Charles R. Pence*, Judge.

AFFIRMED.

*Guthrie, Conrad & Durham* and *Hale Houts* for appellant.

*Davis & Woodruff* for respondent.

ARNOLD, J.—This is a suit in damages for personal injuries.

On the day of the injury, November 6, 1919, plaintiff, a married woman living in Kansas City, was returning from the funeral of one Walter Fleming to whose family she was related by marriage. Defendant, a corporation, operates a line of automobiles and taxicabs for hire in said city and employs drivers or chauffeurs in the operation of such vehicles. On the day in question the widow of said Walter Fleming engaged the undertaking firm of D. W. Newcomer's Sons to take charge of the funeral, and to provide a suitable number of vehicles to convey persons attending the funeral from their homes, or from the residence of the deceased, to the church, thence to the cemetery and to return them to their respective homes.

With these objects in view, the undertaking firm placed an order with defendant for two cabs with drivers, to supplement the number of its own conveyances. One of the cabs furnished by defendant was driven by one A. B. Ross, who was in the general employ of defendant as driver or chauffeur at that time. Ross first drove to the home of Mrs. Fleming, 3118 Holmes street, and there received two passengers who were taken to the undertaking chapel. From said chapel he took passengers

to the church where the funeral service was conducted, and thereafter took several passengers, including plaintiff, to the cemetery at Twenty-third street and Jackson avenue where the interment took place. On leaving the cemetery plaintiff, accompanied by a Mrs. Rogers and Miss Rogers of Clarinda, Iowa, members of deceased's family, got into the cab driven by Ross, and, in addition to these, two other women and a little girl also entered the cab. There is testimony tending to show that the undertaker in charge directed the woman with the child to enter the cab at the cemetery, she not having been in the cab on the trip from the church to the cemetery. Aside from this circumstance it does not appear that the undertaker gave any directions relative to the operation of the cab. Ross testified he did not remember the occurrence above detailed, saying "I did not pay any attention. The cab was loaded." He stated that when it was loaded, he asked the passengers for their addresses and then proceeded to drive them to their respective homes.

He first made two stops near Tenth street and Cleveland avenue where two of the women alighted, leaving plaintiff, Mrs. Rogers and Miss Rogers in the car. They directed the driver to 3118 Holmes street as the next stop and there Mrs. Rogers and her daughter alighted. Plaintiff then was the only remaining passenger, and when she gave her address as 3003 Independence Boulevard, the chauffeur remonstrated because she had not told him where she wished to go when the car was at Tenth street and Cleveland avenue, a point much nearer her home. Leaving the Holmes street place the car was driven north on Holmes, according to the testimony of Ross; turned east on 21st or 22d street to Charlotte street, thence north to 18th street, east to the Paseo, north to Admiral Boulevard and thence to the address of plaintiff on Independence boulevard.

Plaintiff testified the car was being driven at a high rate of speed, and that in turning the corner off of

Holmes street, it "struck something" and "when he struck whatever this was, I, seemed to jump in the air. It threw me, struck my head, and I reeled and started to catch something . . . that was the last I remember until I got to 12th and Paseo. When I came to myself my hat was off, my hair was down and I was crying. I rapped on the glass and tried to call the driver's attention. He didn't seem to hear me because he didn't pay any attention to me." Plaintiff further stated that on reaching her home the driver opened the cab door without leaving his seat and allowed her to alight from the cab unassisted; that her hair was down, her hat off, and she was crying. She stated that 'she said to the driver, after she got out of the car, "Young man, do you know you have almost killed me?" and he replied, "Yes, that was a *hell* of a bounce." Ross denied this conversation but stated he recalled that plaintiff asked for his number and that he gave it to her.

The petition alleges facts practically as above set forth and states that plaintiff was a passenger for hire in one of defendant's automobiles and that "said automobile and taxicab through the negligence and carelessness of defendant, and of its agent, servant and employee as aforesaid, was caused to give an instant, abrupt, sudden and unusually violent lurch, jerk and bump, causing the plaintiff to be thrown suddenly and violently from the seat which she was occupying . . . to and against the top and roof of said taxicab and automobile, by reason of which she was injured," etc. The petition also states that said taxicab "was then and there being operated by, and was under the sole control and management of defendant's agent, servant and employee in charge of said automobile and taxicab and the same was then and there operated for defendant in the course of its business."

The injuries alleged to have been sustained by plaintiff are "a severe bump, lasceration and abrasion of her head, . . . a fracture of the skull, and a severe

shock and concussion in and to her spinal cord, spinal column and all of her nerves and her nervous system; she has been rendered sick and nervous, has suffered a complete nervous collapse and her nerves and nervous system have been shocked, diseased and injured; she has lost and will in the future be required to lose her regular and natural sleep and rest; she has lost the normal and natural use of her voice; she has lost flesh, and has lost the appearance, color and complexion of a well, healthy woman, and has been caused to be and appear as a delicate, unhealthy and sickly woman, she has been rendered unable to perform her usual work, and engage in her usual activities, and has been and will in the future be required to be under the constant care and attention of a physician; she has been caused to suffer and will in the future be caused to suffer from chronic headaches and pains in her head, shoulders and neck.''

Further, it is stated that ''all of plaintiff's injuries aforesaid are permanent and lasting in their nature, character and effect.''

Damages are sought in the sum of $20,000. The answer is a general denial. Upon the pleadings thus made, the cause went to trial to a jury. At the close of all the evidence, defendant asked an instruction directing a verdict in its favor which the court refused. Verdict was for plaintiff in the sum of $5,000 and judgment therefor was entered accordingly. Motion for new trial was overruled and defendant appeals.

It is in evidence that the cab in which plaintiff claims to have been injured was furnished by defendant and that a charge therefor was made by defendant to the undertaking firm of $7.50 for the cab and services of the driver. It was a custom of undertakers to engage cabs of defendant for funerals and a monthly charge, or statement, was rendered by defendant for cabs so engaged and ten per cent of the amount so charged was retained by the undertaker. The undertakers then charged

the family employing them for such services and on the occasion in question such charge was made to the widow of the deceased.

There seems to be no material conflict in the evidence as to the principal facts in the case. Plaintiff's case is bottomed on the negligence of the driver of the cab and the chief question for our consideration is whether said driver, at the time in question, was the servant of defendant or of the undertaker. Defendant urges its demurrer should have been sustained for the reason that the cab and driver were under the control of the undertakers and that defendant was not responsible for the acts of the driver.

It is conceded the fact that the cab was owned by defendant and the driver was under the general employment of defendant would raise a presumption that the driver was defendant's servant and the defendant, therefore, liable for his acts. But as a general rule presumptions may be rebutted and if sufficient evidence is produced to overcome such presumption, the presumption fails. Of the cases chiefly relied upon by defendant in support of his position in this respect is Simmons v. Murray, 234 S. W. 1009, a decision by this court, opinion by TRIMBLE, P. J.                                    *

There is a distinction between the Simmons case and the one at bar in this: In the former case both the general and special employers were made parties defendant, and the finding of this court was directed to the question of whether or not there was sufficient evidence produced to justify the submission to the jury of the question as to whether the servant, at the time of the injury in question, was under the control of the special employer or of his general employer. The jury found it was the special employer who had control of the driver. This court ruled that the special employer actually had given directions to the servant as to the care with which the car should be driven; had instructed him to report accidents to it; that the servant was under the immediate

direction and control of an agent of the special employer and that such agent of the special master was present and directed the movements of the driver. Upon this state of facts the court held the evidence sufficient to support a verdict against the special employer. The court held that the ultimate facts conclusive of the question as to who was the master of the negligent servant must be found to relate to whose work was being done at the time, and who had the right to control the acts of the servant. In the case at bar it is conceded defendant is a common carrier for hire. It also must be admitted that one of the chief purposes for which the company is operated is the transportation of passengers for hire. This being true, we conclude the employment of the offending cab and driver was for the purpose of carrying passengers in the funeral cortege, for which the defendant was paid ultimately by the widow of the deceased Fleming.

The testimony shows there was no supervision exercised over the driver by the undertaker, and while it is true that the right to direct is rather more determinative of the question here involved than the fact that this right was exercised, the act of directing may be, and is, an element in considering whose was the right to give directions, but it may not be wholly controlling. In 26 Cyc, 1522, 1523, this general rule is declared: "It is not so much the actual exercise of control which is regarded, as the right to exercise such control. To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person."

"If one person is under the immediate direction and control of another who may terminate such control by discharge, and direct him what work to do, when to do it, how to do it, and to designate the means to be employed in doing the work, the relation of master and servant between these persons is complete (Beatty v. Thilemann, 16 Daly (N. Y.) 20, 8 N. Y. Suppl. 645), and

the fact that the services are paid for by another is of no importance." [See 34 Cent. Dig., tit. "Master & Servant," sections 1213-1214.] Applying this rule, in Clapp v. Kemp, 122 Mass. 481, it was held that the question whether a teamster through whose negligence in delivering coal one falls into a coal hole and is injured is to be considered, in an action therefor, as the servant of the occupant of the building, depends on whether such occupant had the right to control the manner of delivery.

In Garven v. Railroad, 100 Mo. App. 617, 620, this court held, in effect, that before the general master may be relieved of liability for the negligence of the servant, that such servant must be under the sole or exclusive control of another, and that if the master retains joint supervision or control, the reason upon which the rule is based ceases and the case does not come under the application of the rule. The rule is founded on the principle that a master's liability results from his right of control and direction of his servants, and therefore that in those acts of negligence of the servant committed while the servant is not under the master's control, liability does not attach.

If, therefore, the general master does not resign full control over his servant, his liability for the negligent act has not been severed. In the case at bar there is evidence which tends to show joint control. In this connection we refer to the testimony of Fred Gephart, superintendent of defendant company who, when asked as to whether any instructions were given these drivers with respect to what they should do when they were employed by directors of funerals, answered: "Our instructions were that they were under the undertaker's inspection when they left our garage, and they worked under his instructions altogether."

On cross examination he was asked:

"Q. Did you give any specific instructions to your man Ross when he went to the Fleming funeral? A. No, but he was included with the rest of the drivers when we talked to them along that line.

"Q. That was just some general meeting of the drivers, without respect to this particular funeral? A. We had instructions written at one time in regard to this funeral business, yes, sir.

\* \* \* \* \* \* \*

"Q. Do you know whether any such written instructions were given to Mr. Ross when he went out with a car to this Fleming funeral? A. They wouldn't be given to him personally; they would be given to all the drivers. . . .

"Q. Of course you mean by directions that they were to take directions from the man conducting the funeral as to where they would go and what they were to do? A. Yes, sir.

"Q. You were not attempting to make it the duty of the undertaker to instruct those men as to how they should drive their cars, were you? A. It has been that they instructed them how to drive them.

"Q. With what speed? A. Yes, sir.

"Q. And when they were returning passengers from the cemetery for instance, and not in the funeral procession? A. Not when they are returning, but when they are going to the cemetery."

In the light of this testimony it will not do to say that defendant had released to the undertakers complete control of the chauffeur Ross. Applying the rule in the Simmons case to the facts of the case at bar, the conclusion is inevitable that Ross was engaged in the business of his employer, the defendant. The citations of defendant on this point do not change or modify this rule. The evidence in support of this contention is abundant and is sufficiently substantial to support a verdict against defendant. This ruling is in line with the cases of Glassman v. Harry, 182 Mo. App. 304 and Guthrie v. Holmes, 272 Mo. 215.

The next question for our consideration is whether, as to plaintiff, defendant was a common carrier at the time in question. It is argued that there was no con-

nection whatever between the business of that hour and the general business in which defendant was engaged. But our conclusions as to the point just discussed carry with them our ruling here, as stated above, defendant had not surrendered complete control of its said driver, and therefore it follows that defendant was a common carrier as to plaintiff. She was a passenger for hire in defendant's cab, the service being paid for by the widow of the deceased and intended, in part, for the use of plaintiff. Our ruling is against defendant on this point.

It is also argued that "a great deal of evidence was improperly admitted," and in support of this objection defendant urges that plaintiff should not have been permitted to testify that the cab was "going very fast" and that "it struck something" as there was no evidence that she was observing the movements of the car which might qualify her to make an estimate of its speed.

This question was before the Supreme Court in State v. Watson, 216 Mo. 420, where it is said:

"It is sufficient to say upon this proposition that in our opinion the rate of speed at which an automobile is running is not a matter exclusively for the testimony of experts. If that was true, then, as has been intimated by this court, it would be a matter of impossibility for those injured by the running of vehicles, either automobiles, street cars or regular railroad cars, to always have experts at hand to show what rate of speed was being made. A holding of that character would be wholly impracticable, and do a great injustice to many persons who had been negligently injured by vehicles of the character indicated running at an excessive rate of speed. At last the only reasonable settlement of that question is to hold that witnesses who at least know what an automobile is and have seen them operated, might give their opinions as to the rate of speed. As to the weight to which such opinions are entitled, that is a matter entirely for the jury." [Loc. cit. 433.]

We find no decisions to the contrary on this point. There was no error in this respect.

Instruction P3, as to the measure of damages, is objected to on the ground that it authorized the jury, in the event they found for plaintiff, to assess her damages at such sum as in their judgment, under all the evidence in the case, would reasonably compensate her for the injuries received. The point urged is that this instruction did not require the jury to consider only such injuries as were the direct result of the alleged acts or omissions of defendant.

This question was discussed in Torreyson v. United Rys. Co., 164 Mo. App. 366, 377, and the wording of a similar instruction is there approved. [See, also, same case, 246 Mo. 696, 152 S. W. 32, and Callicote v. Railway, 274 Mo. 289, 204 S. W. 529.] In these cases the instructions complained of were almost identical with the one in question here. We think the word "injuries" as used in the instruction is not too broad and that it includes within its well-known and accepted meaning the results of the damage sustained by plaintiff from the bump, or jolt, shown by the evidence. Defendant points out that Doctor Kuhn, who examined plaintiff, testified that in his judgment the nervousness from which she was suffering could not be attributed so much to the bump as to severe fright. We see nothing in this situation that would in any way modify the rule applied in the cases just cited. Fright from what? It cannot be contended surely that plaintiff received fright from any other source than the accident charged and proved to the satisfaction of the jury. The instruction is in plain language of common and accepted usage and we think it could not have been misunderstood to defendant's prejudice and the action of the court in giving it was not error.

A further objection to this instruction is that it submitted to the jury the question of whether the plaintiff's injuries were permanent, since there was no evidence that they were permanent. There is no merit in this objection. Doctor Newlon's testimony of record is sub-

stantial to this effect and was sufficient to support the instruction.

Defendant further charges the court erred in permitting plaintiff to testify, over objections of defendant, that during the trial she had been examined by Doctor Sloan, a prominent physician of Kansas City, at the suggestion of defendant's counsel and that her testimony was supported, over the objections of defendant, by the statement of the court to the effect that upon application of defendant for the appointment by the court of a physician to examine plaintiff, her counsel had stated she would submit to an examination by any physician suggested by defendant.

The record shows that Doctor Sloan was at the court house in the forenoon of the day upon which this circumstance occurred but he was not placed on the witness stand. Defendant's counsel was permitted to explain why Dr. Sloan's testimony was not utilized and his explanation was, in effect, that the Doctor had not had time to examine thoroughly into plaintiff's condition and therefore his testimony would not be material. Further it appears that neither the court nor plaintiff's counsel knew of the presence of Dr. Sloan in court that day and that defendant's counsel had dismissed him. Defendant cites Crane v. Railways Co., 199 Mo. App. 448, 203 S. W. 640, in support of its contention in this respect. There the rule is stated that "all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted." [Kirk v. Middlebrook, 216 Mo. 245, 288; Powell v. Railroad, 255 Mo. 420, 447.]

This rule finds application in instances where the party failing to call a witness, or to produce matters of evidence, has the advantage of the other by having the witness, or matter of evidence, within easier control. [Bank v. Worthington, 145 Mo. 91, 103; Kersher v. Vorweg, 130 Mo. 196, 201; Bent v. Lewis, 88 Mo. 462, 470.] Under the facts in evidence here it appears this

case falls within the class of cases where the defendant had the witness under easier control. We find no error in this circumstance. [Willitts v. C. B. & Q. Ry., 221 S. W. 65, — Mo. —.]

Finally defendant charges that the verdict is excessive. We are loth to interfere with the verdict of a jury under circumstances presented in this case, The proof seems to have been abundant and convincing that plaintiff, prior to the injury, was a vigorous, healthy woman, that as a result of the injury she suffered a nervous collapse and since has been beset by pain and melancholy. These matters were uncontradicted and there is substantial proof that her condition will be permanent. In this state of fact swe do not feel justified in interfering with the verdict.

The judgment is affirmed. All concur.