Ferdinand Emil SCHEPP, Appellant,

v.

MID CITY TRUCKING COMPANY and Bituminous Casualty Company, Respondents,

Pacific Intermountain Express and Truck Insurance Exchange, Appellants.

Nos. 29414, 29423.

St. Louis Court of Appeals.

Missouri.

June 12, 1956.

Thurman, Nixon & Blackwell, Hillsboro, for Ferdinand E. Schepp.

Fred B. Whalen, St. Louis, and John S. Marsalek (of Moser, Marsalek, Carpenter, Cleary & Carter), St. Louis, for appellants Pacific Intermountain Exp. and Truck Ins. Exchange.

Albert I. Graff, Malcolm I. Frank, St. Louis, for respondents Mid-City Trucking Co. and Bituminous Cas. Corp.

GEORGE P. ADAMS, Special Judge.

Appellant-claimant, Ferdinand Emil Schepp, filed a Workmen's Compensation claim naming respondent, Mid City Trucking Company of St. Louis and appellant Pacific Intermountain Express of St. Louis (hereinafter referred to as "Mid City" and "PIE") as employers, and Bituminous Casualty Company and Truck Insurance Exchange as their respective compensation carriers. Reference to "Mid City" or "PIE" shall, unless otherwise indicated, also include their insurance carriers.

The Referee made an award in favor of claimant and against Mid City and PIE. On applications for review, filed by Mid City and PIE, the Commission entered its final award affirming the Referee's finding in favor of claimant and against both Mid City and PIE. PIE and Mid City appealed to the Circuit Court of the City of St. Louis. The Circuit Court entered its judgment affirming the Commission's finding and award as to PIE and its insurer, and reversing the award as to Mid City and its insurer.

The cause is before us on separate appeals by claimant, and by PIE and its carrier. A joint transcript of record was filed and both appeals are considered and decided herein.

No issue is made as to the fact of the accident or the injury or the amount of compensation. The sole question for determination is who is liable for compensation under the Act. Mid City says PIE is liable under the borrowed servant doctrine. PIE says it never had or exercised such control over claimant as to assume the status of employer to him; that Mid City remained the employer throughout, and is liable.

In addition to doing local hauling, Mid City also leased or contracted automobile tractors and drivers to concerns in the trucking industry in St. Louis.

PIE is an interstate common carrier. It did no local hauling, but delivered and picked up interstate freight in St. Louis. It had 13 drivers of its own who ordinarily would handle the deliveries and pickups,

but if there was an "overflow", it would contact Mid City, or some other company that leased tractors and drivers, and have them send over the number of tractors and drivers needed on a particular day to handle such overflow.

The arrangements between PIE and Mid City had existed for approximately a year before the accident. They were similar to those made with other companies leasing tractors and drivers, and were substantially as follows: Mid City furnished the tractor and driver; and all expenses, including wages of the drivers, gas, oil and repairs for, and upkeep of, the tractors were paid by Mid City; it leased the tractor and the man; usually the tractors were owned by Mid City, but they always had Mid City's name on the doors; the trailers were owned by PIE and had its name on them; PIE paid Mid City $4.25 per hour for the time it used the units, that is, the tractors and the drivers, which was the "standard price" paid by concerns similar to PIE; a half hour driving time was allowed and Mid City did not charge for the first and last fifteen minutes; sometimes PIE would use a particular tractor and driver a full day, and sometimes only part of a day; PIE would not notify Mid City as to the drivers' starting and quitting time; if PIE did not need the tractor and driver any more that day it would tell the driver and he would call his dispatcher at Mid City for orders; if a particular job was not finished on a certain day, the tractor and driver did not report back the next day; PIE would call again in the morning for such number of units needed; PIE had to call each day; PIE did not ask for the driver by name, it just requested so many tractors and took whatever drivers were sent; PIE never told Mid City what tractor or driver to send, that was left entirely up to Mid City; PIE never discussed the driver's pay or earnings as that was up to Mid City; if a driver was injured, became ill, or a tractor broke down, PIE would not do anything about it, but the driver would call his dispatcher at Mid City; Mid City would try and replace the man, but if it could not, PIE would bring the load in; PIE had no authority to discharge, nor did it attempt to discipline, the drivers; if PIE was not satisfied with the driver's work, it would call Mid City or such other companies as had furnished the unit, and they would take action; if a driver was intoxicated or did something out of order, PIE would call Mid City; the drivers would call into the PIE dispatcher in the morning, at noon and in the afternoon (and sometimes as many as five times a day) so the dispatcher would know how they were getting along, or the driver might want to know whom to give freight to, or if the driver got tied up or was not doing too well, PIE could arrange for an additional tractor and driver from Mid City or someone else; PIE had the right (but one which the dispatcher at the time of claimant's injury had never exercised) to have a tractor and driver bring a load back in if the driver was at a terminal where he could not get unloaded for several hours, in which event PIE would give the unit another load; PIE did not give Mid City's drivers any instructions as to how they were to handle their tractors; contract drivers were experienced men and there was not much PIE would have to tell them; if it was necessary to give the driver specific orders for "every little detail" PIE would contact Mid City and tell Mid City it did not want a man like that; the drivers were experts and PIE did not have to instruct them "in the work" but it did "have the right to do so"; PIE could "to a certain extent" tell the drivers what to do; the tractor and driver would report to PIE, be directed to an already loaded trailer, handed a manifest (showing what the freight was and where it went) and bills of lading and told to get rid of the load; the driver would then couple his tractor to the trailer and deliver the freight; no one from PIE accompanied the driver; PIE did not instruct the drivers as to their work for the day unless the dispatcher had specific instructions from somebody such as a COD or Shipping Order, then he would be sure that the man knew how to handle that; on occasions PIE would instruct a driver to make pickups, usually after the deliveries were made; the instructions given by PIE were "those confined entirely to the accomplishment of the purpose of completing the delivery of freight, or the

636

bringing of freight" to PIE's Terminal, "that particular purpose of getting the freight delivered to a definite location" or "a matter of getting the freight picked up"; PIE's dispatcher had a sheet upon which he entered the driver's name and the time the unit was used so that when PIE got a statement from Mid City it could see if it checked; the driver, however, would report his time to Mid City; Mid City drivers were not listed on PIE payrolls and PIE did not pay social security or withholding taxes on them.

In June, 1953, claimant started working for Mid City as a driver of one of its tractor units. His duties were driving a truck and unloading freight. His wages were paid by Mid City. Mid City withheld income tax and social security payments out of his wages.

Claimant and his tractor were sent to different trucking companies in St. Louis. The arrangement with them was that the tractor was furnished with a driver. These companies told claimant about the same as PIE, i. e., what and where to deliver, and gave him manifests and bills of lading.

When claimant bought gas and oil at filling stations he charged it to Mid City. If he paid a bridge toll, he would collect it back from Mid City.

The first time that claimant hauled a PIE trailer with a Mid City tractor was about a month after he started to work for Mid City. His unit pulled tractors for PIE and one time when the brakes went out on his tractor, he used a PIE tractor to pull the load. Claimant reported to work each morning at 8:00 a. m. at Mid City's office and terminal and would be given his directions as to what he was to do that day. If he was sent with his tractor to PIE he would be instructed to report to PIE's dispatcher, who would tell him what duties he was to perform, and the number of the trailer his unit was to haul. He would be given a manifest showing what the freight was and where it went and would then be told by PIE's dispatcher, "Here's your load. Get rid of it." He would then couple his tractor to the PIE trailer, which had already

been loaded, and proceed to deliver the freight. Claimant worked by himself; he did not have a helper. The tractor was usually loaded so that it could be unloaded according to a certain route and claimant was supposed to follow that route in going from one terminal to another in delivering the freight. The method of getting rid of the load was left up to the driver. Claimant could select the streets that he would travel between terminals, subject only to city traffic regulations. PIE wanted them to get rid of the load as fast as they could in order to get another load.

Whenever claimant and his tractor were leased to PIE "they was our boss for the day, they told us what to do, how long to work and when to quit and everything". PIE was "our boss for the day * * * with respect to the freight to be hauled". Claimant did not know the exact arrangement that required him to take his tractor to PIE. That was something entirely between Mid City and PIE. He wasn't told "anything about that". All he was told was "they (Mid City) sent us up there and they (PIE) was our boss for the day and we was to do what they said", insofar as delivering freight. The "only thing that they (PIE) used to tell us was how long we had to take for dinner and when to come in and something like that". The drivers were required by PIE to keep the lock on the back of the trailer locked at all times, "regardless if you only went ten feet", and they were instructed to be "very courteous to everybody on the street whether it meant you was in the right or not you still had to give the other man the courtesy", and his boss at Mid City told him to "comply with it". He was also told by Mid City to follow out any instructions given by PIE with respect to handling the freight. Mid City told claimant to do what PIE said to do, "that is their (PIE) rules and that was the way it had to be followed out"; that "every company has their own rules and that was what we had to comply to". If he was told by Pie to drive the tractor around empty that was what he had to do.

The reason he responded to PIE rules and did what PIE told him to do was because

he had been instructed by Mid City to do so. When claimant went to PIE and they were his "boss" for the day, he "knew about it" and "consented going"; he made his consent to his employer Mid City and consented because "we would have to go—if we wanted to work we'd have to go".

Any complaint about working conditions was made to "our boss at Mid City—our superior".

If claimant's tractor broke down he would call PIE that he was broke down and he would call Mid City and they would send him a mechanic.

When he finished for PIE he reported to Mid City the hours his unit had worked. He did not report his hours to PIE.

PIE never paid him any wages and never made any agreement that they would pay him. Claimant received no more wages for hauling PIE freight than for hauling Mid City freight—just "union scale".

At the time of the accident about six different men per week would come to PIE from Mid City. Claimant did not come any more often than other Mid City men.

The day before the accident claimant told PIE's dispatcher about the way the freight was loaded; that he had to move almost half his load to get freight out.

Bill Sands, dispatcher at PIE, had called for claimant several times.

On the morning of the day of the accident, December 14, 1953, PIE had called Mid City for some tractors and drivers. Claimant reported for work at his employer's, Mid City's, office at 8:00 a. m. A Mr. Tingus, Mid City's dispatcher and one of his bosses—one of the "owners" of Mid City, directed him to go up and make freight deliveries for PIE that day. He was instructed to report to Bill Sands, at PIE's Terminal. He drove a tractor belonging to Mid City with the name "Mid City Trucking Company" on the side. He reported to Sands and was told what duties he was to perform and the trailer he was to use. He was given a manifest as to what the freight was and where it went. He connected his tractor to the trailer, left the PIE Terminal, and made deliveries of the freight that was in the trailer. About 10:00 a. m., while he was unloading freight from the trailer at the Viking Freight Line Terminal, some ventilating fans loaded in the trailer fell on him, causing his injuries. The pain was not too bad at first and he went on working until around 2:00 p. m. when the pain started bothering him. He called his boss at Mid City and told him about the accident. He did not call PIE. His boss told him to see if he could not "make the day out and go to the doctor tomorrow".

However, the next day "it was the same thing" and his boss said, "we need you see if you can't work today and try it the next day". Claimant reported back to Mid City's Terminal at about 5:00 p. m. after the accident. It was three days after the accident "before I (claimant) really got to go to the doctor—that they (Mid City) would leave me go to the doctor". He was finally sent by Mid City to its doctor. After the accident, he continued working, a day of work, and a day off. He was suffering constant pain. If he had to work on the day he was supposed to see the doctor, Mid City would say it was pretty busy and told him to see if he couldn't go "tomorrow" and he would go to the doctor on his day off. He never did report the accident to any one connected with PIE, and no one at PIE ever asked claimant whether he was injured at work. Claimant was "dealing with (his) own employer with respect to treatment and the injury."

The arrangement under which he was working on the day of the accident was the same arrangement that prevailed when working for other truck lines with Mid City equipment.

Under date of December 17, 1953, Bituminous made out a "Report of Injury" on Division of Workmen's Compensation Form 1, showing Mid City as claimant's employer and Bituminous its insurer. No mention was made of PIE. This report was filed with the Commission on February 5, 1954.

Under date of May 19, 1954, claimant filed his original claim for compensation,

naming Mid City and PIE as employers. Under date of May 22, 1954, Mid City filed answer to this claim. Line 17 of the Commission's Form 22, "Answer to Claim for Compensation" used by Mid City and Bituminous, stated: "All of the statements in the Claim for Compensation are admitted except the following." Following this line, Mid City denied only: (1) that employee sustained temporary disability, (2) that employee would sustain future temporary disability, and (3) that employee would sustain any permanent disability. There was no denial that claimant's employers were not as named in the claim.

Under date of August 18, 1954, PIE filed answer to the original claim denying that it was claimant's employer and alleged that Mid City was claimant's employer.

Under date of August 6, 1954, claimant filed his First Amended Claim for Compensation, again naming Mid City and PIE as his employers. Under date of August 11, 1954, Mid City filed its Answer to the Amended Claim in the identical wording of its first answer, and again made no denial that it was an employer of claimant. PIE apparently filed no new answer to the amended claim.

On January 17, 1955, a hearing was had before the Referee. At the hearing, Mid City denied that claimant was its employee, but admitted claimant was operating under and subject to the Compensation Law. PIE denied that claimant was its employee. Mid City admitted due notice of the accident. PIE stated it did not have notice of the accident, but would not "contest that point". Mid City acknowledged furnishing medical aid to claimant. Claimant had provided no medical aid for which he was making a claim. In a letter to the Compensation Commission seeking a resetting of the hearing, attorneys for claimant said: " * * * Bituminous Casualty Corporation and claimant have reached an agreement to settle this case, and the claimant is prepared to admit the pleading filed by Pacific Intermountain Express in which that defendant states that they are not liable in this proceeding since Mid City was the primary employer of the claimant. In view of the fact that the only thing that is left to be done is to present the settlement worked out to the Referee for his approval, and to request the Referee to dismiss as to Pacific Intermountain Express, * * *".

On January 24, 1955, the Referee made an award in favor of claimant and against both Mid City and PIE as heretofore stated.

Mid City filed Application for Review before the full Commission, claiming that the Referee erred in finding that it was an employer of claimant at time of accident and asserted that claimant was a loaned employee to PIE and the award should have been against PIE only.

PIE filed Application for Review before the full Commission, claiming any and all findings that claimant was an employee of PIE was unwarranted by the evidence.

On March 31, 1955, the full Commission made a final award, in part as follows:

"We find from all the evidence that Ferdinand Emil Schepp, employee herein, sustained an accident arising out of and in the course of his employment December 14, 1953, while jointly employed by Mid-City Trucking Company and Pacific Intermountain Express; * * *

"We further find * * *, and that both employers and carriers are jointly and severally liable for the payment of the award herein, the insurers being primarily and directly liable therefor. We feel, as we have so found, that this is a case of joint employment, that both employers and insurance carriers are liable, and that the liability of Mid-City Trucking Company as general employer is beyond question; * * *".

Both Mid City and PIE appealed to the Circuit Court of the City of St. Louis.

On May 19, 1955, the cause was heard before the Circuit Court and on June 19, 1955 it found that the Commission erred in finding against both employers and affirmed the Commission's award against PIE and

Truck Insurance Exchange, and reversed the award as to Mid City and Bituminous Casualty Company.

Under a strikingly parallel arrangement involving the use of a vehicle and driver, the Supreme Court, in Wills v. Belger, 357 Mo. 1177, 212 S.W.2d 736, 738, held that the borrowed servant doctrine did not apply.

In that case, Richard Belger, doing business as the Belger Cartage Service, furnished the Morgan Grocery Company trucks and drivers to deliver groceries to Morgan's customers. On the day of the accident, because the Belger driver, Kimberlain, was unfamiliar with the route to be taken in delivering the groceries, Morgan had plaintiff Wills, one of its employees, go along with the truck and driver to direct Kimberlain where to go. While rounding a corner, Kimberlain struck a curb and Wills was thrown from the truck and injured. Wills sued Belger for the negligence of its employee and Belger defended on the theory that Kimberlain was the borrowed servant of Morgan. The Supreme Court affirmed the trial court's judgment entered on a jury's verdict against Belger.

A review of the evidence in the Wills case demonstrates the similarity between the arrangements there and here.

Belger was in the business of furnishing trucks and drivers for hire to concerns needing delivery services; he owned the trucks and hired, fired and paid the drivers; the truck and driver were furnished at an hourly rate; Belger regularly furnished Morgan one truck and driver; Morgan had a truck and driver of its own; if, in the event of an emergency or an increase of business, Morgan needed an additional truck it would call Belger's dispatcher and the first truck that came in with a driver that "fits the picture, or who had been there before" was sent; Kimberlain had been in Belger's general employment as a truck driver for about four months; he would report to Belger's office each morning and some one there would tell him where to go; when Belger would send a truck and Kim-

berlain to Morgan's he knew the type and kind of work that would be done, that groceries would be hauled and delivered to Morgan's customers; the purpose of sending the truck and driver was "'to do delivering'"; Belger furnished the gasoline, oil, repairs and road service for the trucks; if the truck got out of repair, Kimberlain would phone Belger and one of Belger's mechanics would come out and get it and take it to Belger's shop for repair; Belger was "'subject to cargo loss'" and carried "drivers insurance"; Morgan could tell Kimberlain what to haul, how much to haul, and where to go; Belger was not concerned as to whether or not the truck and driver were used or what they hauled or where they went; after Belger sent a truck and driver to Morgan's, Morgan could call for a change and in that event Belger could substitute one driver for another; Morgan could tell Kimberlain he was "'through with him'" and he would report back to Belger; when the day was over or the work finished, the driver would report to Belger's office; Kimberlain reported to Belger's each evening, checked out with a girl there who made a record of how long he had been out that day and left the truck in Belger's garage for the night; Belger kept the time sheets for the drivers and collected at an hourly rate for the time put in at Morgan's; Belger did not always send the same truck and driver but sent different drivers and different trucks "several times"; Kimberlain had been to Morgan's once or twice before; on the date of Wills' injuries, Morgan's own truck was out of service and it called Belger to furnish an additional truck and driver; Kimberlain reported in at Belger's at 8:00 a. m. ready to go to work and was told to go to Morgan's; he took a truck with a sign "'Belger Cartage Service since 1919'" on its side; he went to Morgan's and assisted in loading the truck with groceries to be delivered to Morgan's customers; Kimberlain had everything to do with driving and operating the truck; Wills had direction slips and bills of lading but had nothing to do with driving the truck; he could tell the driver where to go, but had no other control over him; while making deliveries, Wills was

standing on a sack of flour on the tailgate of the truck holding groceries on the truck; as stated, the truck, in rounding a corner, hit a curb and Wills was thrown off and injured; at the same time, a sack of flour fell off and broke and Wills told Kimberlain " 'he would have to go back over and get' " another sack, and Wills sat on the curb and waited until Kimberlain came back; about 7:15 that evening Kimberlain finished work and returned to Belger's and "punched out" and left the truck in Belger's garage where it was placed every night; he reported to the girl at Belgers as to where he had been and she made a record to show how long he had been with Morgan's; then he went home; he never made any report to Morgan.

The issue before the Supreme Court in the Wills case is stated at page 740(6) of 212 S.W.2d of the opinion: "The question here is whether we can say, as a matter of law, that Morgan [PIE] had sole and exclusive control of the driver [Schepp] at the time and place in question; and that appellant [Mid City] had no right to control the acts of the driver [Schepp] causing the injury."

■ Continuing to paraphrase, we find that the issue in the instant case is settled by the Supreme Court in that case where it holds, 212 S.W.2d at page 741(7): "This evidence, * * *, was sufficient for the jury [Commission] to infer and find that, at the time and place in question, Kimberlain [Schepp] was engaged in the discharge of appellant's [Mid City's] business in the hauling and delivering of the merchandise [freight] for hire; that Kimberlain [Schepp] was acting within the scope and course of his employment as a truck driver for appellant [Mid City]; and that appellant [Mid City] had not resigned and Morgan [PIE] had not taken full and complete supervision and direction of Kimberlain [Schepp] in the driving and operation of the truck [tractor] at the time respondent [Schepp] was injured. O'Brien v. Rindskopf, supra [334 Mo. 1233, 70 S.W.2d 1085]; Scherer v. Bryant, supra [273 Mo. 596, 201 S.W. 900]; Boroughf v. Schmidt, Mo.App., 259 S.W. 881, 883; Burke v.

Shaw Transfer Co., 211 Mo.App. 353, 243 S.W. 449, certiorari quashed in State ex rel. Shaw Transfer Co. v. Trimble, Mo.Sup., 250 S.W. 384, 386. Clearly, the evidence does not conclusivly show, as a matter of law, that appellant [Mid City] had released full and complete control of Kimberlain's [Schepp's] activities and there was no such complete and permanent severance of the servant's employment from his general employer [Belger and Mid City] as in the McFarland case [McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 136 A.L.R. 516]. The Court [Commission] did not err in refusing to direct a verdict for appellant [in finding that the liability of Mid City as general employer was beyond question]".

■ The relation of employer and employee exists between a special employer and a loaned employee whenever "the following facts concur: (a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue". Ellegood v. Brashear Freight Lines, Inc., 236 Mo.App. 971, 162 S.W.2d 628, 633(4); Andra v. St. Louis Fire Door Company, Inc., Mo.Sup., 287 S.W.2d 816, 819(2).

Do the facts in the instant case meet the test? Do all elements of the test "concur"?

■ Control, or lack of control, of the employee, while of "greatest significance", is not conclusive. Coy v. Sears, Roebuck & Co., 363 Mo. 810, 253 S.W.2d 816, 818(1). In any event the "control" must be authoritative direction and control, not mere suggestions as to details or necessary cooperation. Scherer v. Bryant, 273 Mo. 596, 201 S.W. 900, 902; O'Brien v. Rindskopf, 334 Mo. 1233, 70 S.W.2d 1085, 1089(4). The mere fact that the general employer permits some division of control does not give rise to the inference that he has surrendered control. Restatement of the Law,

Agency, Section 227, page 501. Surrender of partial control in a third person does not relieve the general employer. Boroughf v. Schmidt, Mo.App., 259 S.W. 881, 883(2). An employee is not "lifted out of his general employment and set down in the service of another by the mere fact that such other is authorized by the general master to indicate the work to be done or to furnish information or give signals calling the servant into activity". Scherer v. Bryant, supra, 201 S.W. 902; Standard Oil Co. v. Anderson, 212 U.S. 215, 222, 29 S.Ct. 252, 254, 53 L.Ed. 480. The general employer must release full and complete control. Wills v. Belger, supra, 212 S.W.2d 741. The fact that directions are given the driver as to when and where to go, what shall be carried, or that he was told to hurry or take his time, or that he also assisted in the work the hirer was doing for which the unit was used, does not relieve the general employer. O'Brien v. Rindskopf, supra, 70 S.W.2d 1089.

The "control" surrendered by Mid City and exercised (or the right to exercise) by PIE did not meet the quantum of control necessary for the invocation of the borrowed servant doctrine. If Morgan's control in the Wills case (which was more detailed and constant than here, because Morgan's servant was present at all times with Kimberlain) was insufficient to authorize the application of the doctrine, certainly PIE's control falls short of that which must be present to justify an application of the doctrine. At all times Schepp was alone once he left PIE's terminal.

In both the Wills case and here, an "entity" or "unit" composed of the vehicle and driver was hired. While Morgan and PIE acquired "domination and authority over the entity to designate the work that shall be done and direct the manner of doing it", they acquired "no authority to direct how the team (vehicles) shall be driven, managed, or cared for"; nor could they "divide the entity by separating the driver from the team (vehicle)". They could "dispense with the services of the entity—the driver and team (vehicle)" but could not "discharge the driver and sub-stitute another". O'Brien v. Rindskopf, supra, 70 S.W.2d 1091; Wagner v. Larsen, 174 Wis. 26, 182 N.W. 336, 337.

Schepp entered the service of PIE at the "command and pursuant to the direction of" his employer and though he was subject to some direction by PIE, he was there "in obedience to the command of his employer, and in doing what the new master directs him to do, he is performing his duty to the employer who gave him the order". No new relationship is created. Andra v. St. Louis Fire Door Company, Inc., supra, 287 S.W.2d 820, 821.

Because counsel for all the parties have emphasized the question of the right to control as the basis for determining whether claimant was an employee of Mid City or PIE, we have taken up the last phase of the test set out in the Ellegood case first.

However, equally as important to the creation of the relationship of employer and employee as the special employer's right to control is the employee's consent "to work for the special employer".

Once shown, the presumption is that a general employment continues. Restatement of the Law, Agency, Section 227, page 501; Larson, Workmen's Compensation Law, Vol. I, Section 48.10, 711, 712; Andra v. St. Louis Fire Door Company, Inc., supra, 287 S.W.2d 819(2); Boroughf v. Schmidt, supra, 259 S.W. 884; Burke v. Shaw Transfer Co., 211 Mo.App. 353, 243 S.W. 449, 451(1). Especially if the general employer is in the business of renting machines, Restatement of the Law, supra, page 502. To overcome this presumption, the evidence must disclose a "clear demonstration that a new temporary employer has been substituted for the old" including a showing "that a contract was made between the special employer and the employee ("(a)" and "(b)" in the Ellegood case), proof that the work being done was essentially that of the special employer ("(b)" in the Ellegood case), and proof that the special employer assumed the right to control the details of the work" ("(c)" in the Ellegood case). Larson, Workmen's Compensation Law, supra; Andra v. St.

Louis Fire Door Company, supra, 287 S.W. 2d 819(2). While "consent" to work for the special employer may be inferred from an employee's acceptance of and obedience to orders given him by the "special employer", Ellegood v. Brashear Freight Lines, Inc., supra, 162 S.W.2d 633(5), such "acceptance of and obedience to orders" must be considered in connection with all the facts and circumstances in evidence, and the mere physical act of performing some service that is the "work of and for" the special employer, pursuant to the command of the general employer does not alone justify the inference of "consent". Andra v. St. Louis Fire Door Company, Inc., supra, 287 S.W.2d 820.

■ There is no express consent in the instant case. If it is present, it must be implied. The facts and circumstances and acts and conduct of all the parties must show a deliberate and informed consent by the claimant to the substitution of a new temporary employer. Larson, Workmen's Compensation Law, supra; Andra v. St. Louis Fire Door Company, Inc., supra, 287 S.W.2d 819(2). The consent must be voluntary. "An employee, for compensation purposes, cannot have an employer thrust upon him against his will or without his knowledge". Stroud v. Zuzich, Mo.Sup., 271 S.W.2d 549, 556(2, 3). Nor will he be held to have lost his original employer without his knowledge. There must be a "consensual" relationship between the loaned employee and the special employer. Stroud v. Zuzich, supra, 271 S.W.2d 556 (2, 3).

If such a "consent" is found to exist, it must be inferred solely from the fact that, in obedience to the orders of his general employer, claimant accepted and responded to PIE's instructions, directions and rules; that he stated PIE was his "boss" for the day; and that he knew about the "arrangements" and "consented going" (because he had to—if he wanted to work).

If all the other facts and circumstances and acts and conduct of the parties are so inconsistent with an implication of the "consent" necessary to thrust a new em-

ployer upon claimant, then as a matter of law we must hold that claimant remained in the employ of Mid City. We think they are and we so hold.

In contrast to those acts and conduct that Mid City insist show a change of employer, consider that: claimant was hired and paid by Mid City; Mid City alone could fire him; Mid City deducted the social security taxes from his wages (and presumably paid the *employer's* portion of the tax); Mid City withheld income tax deductions (as an *employer* is required to do); claimant's work for PIE was infrequent and never for more than one day at a time; each day Mid City selected the particular driver and tractor to send to PIE; PIE had nothing to say as to what driver would be sent; claimant reported to Mid City each morning for orders and reported each night as to where and how long he had been; Mid City told him where to go (on penalty of not working if he didn't go); he looked to Mid City for reimbursement for bridge tolls; any complaints he would have he would make to Mid City; PIE could not discipline him; PIE could not fire him; if he became ill, he would report to Mid City; he reported this accident to Mid City and did not report to PIE; his persistence in seeking medical aid from Mid City; Mid City finally furnishing medical aid through its own doctor; Mid City filing Report of Injury, acknowledging itself to be the employer and not mentioning PIE as an employer; Mid City's Answers admitting its status as employer.

Reasonable minds could not differ in their conclusions under the facts here; a finding that Mid City was claimant's employer and that PIE had not assumed that status is compelled by the facts, circumstances, acts and conduct of the parties. Claimant had not consented to a change of employer.

Before an employee is denied or deprived of his rights to pursue compensation claims against one employer or pursue common law negligence actions against another, there must be a clear and unequivocal showing that the employee with knowledge of his rights accepted an employer different

from the one for whom he originally started to work.

We have mentioned as one of the considerations inconsistent with a showing that claimant, Mid City and PIE intended to create a new employer-employee relationship, Mid City's Report of Injury and its two Answers to claimant's Claim and Amended Claim for Compensation.

However, these admissions take on a greater significance. They are analogous to pleadings and are admissions against interest. Ellegood v. Brashear Freight Lines, Inc., 236 Mo.App. 971, 162 S.W.2d 628 (claim); Tralle v. Chevrolet Motor Co., 230 Mo.App. 535, 92 S.W.2d 966, 970 (3, 4) (Report of Accident); Lumpkin v. Sheidley Realty Co., 227 Mo.App. 306, 53 S.W.2d 386, 388(2, 3) (Report of Accident); Lamkins v. Copper-Clad Malleable Range Corporation, Mo.App., 42 S.W.2d 941, 943(3, 4) (Report of Accident).

Mid City seeks to escape the effect of these admissions with the claim that the filing of the report of accident and answers is required by the Act and, therefore, not a voluntary act on the part of Mid City, but was an act that they "were compelled to do by virtue of the law".

█ It is true that employers are required to file reports of injury and, if they desire to deny all or parts of claims filed against them, they must file answers. But answers to claims for compensation serve the same office as answers in common law suits and should apprise claimants of the allegations of the claim that are to be put in issue. Any facts alleged in the claim that are not thus denied, are admitted, and that, of course, includes the allegation naming the employer and insurer. If through mistake, oversight or inadvertence, a statement is made in a report of injury, or an employer fails to make a denial of some allegation in the claim, it may seek leave to amend so as to correctly report the injury or plead a denial of some allegation in the claim omitted through such mistake, oversight or inadvertence. Probst v. St. Louis Basket & Box Co.,

Mo.App., 52 S.W.2d 501, 503, certiorari quashed, State ex rel. Probst v. Haid, 333 Mo. 390, 62 S.W.2d 869, 873(7) (Answer). However, absent such amendment or some other explanation of the failure to report the name of the employer correctly or the failure to deny its status as employer, such admissions are binding. Ellegood v. Brashear Freight Lines, Inc., supra, 162 S.W.2d 634(7–9); Wills v. Belger, supra, 212 S.W.2d 736, 740(6).

█ The report of injury was signed three days after the accident and filed with the Commission one month and twenty-two days after the accident. Mid City's first answer was executed five months and seven days after the accident, and its answer to the amended claim for compensation was executed seven months and twenty-eight days after the accident. It would have imposed no hardship on Mid City to have ascertained and declared its relation to claimant in the period of time from the date of the accident until the date of the hearing on January 17, 1955. At the hearing, one year, one month and three days following the accident, for the first time Mid City repudiated its employer relationship with claimant.

On the other hand, PIE's answer and only pleading to the claim denied that claimant was its employee, and asserted that he was in the employ of Mid City. This denial was again made at the hearing before the Referee.

Among the cases cited by Mid City as supporting its contention that claimant was a special employee of PIE are Williamson v. Southwestern Bell Tel. Co., Mo.Sup., 265 S.W.2d 354, 358; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S.W.2d 909, 916; Pruitt v. Harker, 328 Mo. 1200, 43 S.W. 2d 769, 772, 773; Clayton v. Wells, 324 Mo. 1176, 26 S.W.2d 969, 972; Maher v. Donk Bros. Coal Co., 323 Mo. 799, 20 S.W.2d 888, 893; Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.W. 2d 647; and, Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55. It will serve no purpose to further lengthen this opinion by detailing

the distinguishing features of each of these cases. It suffices to say that they do not involve legal and factual situations similar to those in the instant case.

Three other cases cited by Mid City, (and PIE as well) Stroud v. Zuzich, Mo. Sup., 271 S.W.2d 549; Hargis v. United Transports, Inc., Mo.App., 274 S.W.2d 339, and Standard Oil Co. v. Anderson, 212 U.S. 215, 220, 29 S.Ct. 252, 253, 254, 53 L.Ed. 480, support the conclusions we reach herein.

Mid City relies principally on Ellegood v. Brashear Freight Lines, Inc., supra, and McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S.W.2d 67, 136 A.L.R. 516.

The Supreme Court, in the Wills and Stroud cases, and the Springfield Court of Appeals in the Hargis case, considered both of these cases and, under sets of facts very similar to those in the instant case, distinguished them.

In the McFarland case there "was shown a complete severance of Whalen's employment from his (former) general employer, defendant", Stroud v. Zuzich, supra, 271 S.W.2d 555, and the case "turned upon peculiar and admitted facts conclusively showing a complete severance of the servant's employment from his general employer." Wills v. Belger, supra, 212 S.W.2d 740.

Certainly here there was no "complete severance" of Schepp's employment with Mid City.

In the Ellegood case, plaintiff had filed a claim for compensation against the same defendant he was suing in a common law negligence action and "the cause was ruled as a matter of law upon his admissions". Wills v. Belger, supra, 212 S.W.2d 740.

Further, the evidence in that case was abundant that Ellegood regarded Brashear as his new employer. He saw his general employer only once a week and was in the constant service of Brashear for a week at a time; the tractor was not returned each night to the general employer's premises but remained in possession of plaintiff and Brashear during the entire week; following the accident plaintiff took the tractor to Brashear and made out an accident report to Brashear; after the accident, he returned and worked for Brashear for five months driving the same tractor; he constantly importuned Brashear to send him to a doctor; finally Brashear *fired* him and told him to go home with his truck; plaintiff filed a compensation claim against Brashear as his employer.

Our holding here in nowise conflicts with either the McFarland or Ellegood cases.

Claimant was not an employee of PIE and there was no evidence from which the Commission could find that he was "jointly employed" by or in the "joint employment" of Mid City and PIE. McFarland v. Dixie Machinery & Equipment Co., supra, 153 S.W.2d 70; Suverkrubbe v. Village of Fort Calhoun, 127 Neb. 472, 256 N.W. 47, 49.

Mid City concedes, and in fact asserts, that the Commission "were undoubtedly in error" in holding both PIE and Mid City responsible as joint employers. Claimant makes no point that it was not error.

Mid City and Bituminous Casualty Company alone are liable for compensation herein.

The judgment of the Circuit Court is reversed and the cause is remanded with directions to the trial court to reverse the award and remand the cause to the Industrial Commission with directions to said Commission to enter a new award in favor of claimant, the same in all respects as the one heretofore entered except that it be against the Mid City Trucking Company as employer and the Bituminous Casualty Company as insurer and that Pacific Intermountain Express and Truck Insurance Exchange be discharged.

ANDERSON, P. J., and N. T. CAVE, Special Judge, concur.